1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
                           AT SEATTLE

9

10   WEINSTEIN & RILEY, P.S., et al.,           CASE NO. C08-1694JLR

11              Plaintiffs /                     FINDINGS OF FACT AND
                Counter-Defendants,             CONCLUSIONS OF LAW

12        v.

13   WESTPORT INSURANCE
     CORPORATION,

14
                Defendant /
15              Counter-Claimant.

16

17        This matter came on for trial on May 3-5, 2010, before the court sitting without a

18   jury.  Plaintiffs/Counter-Defendants Weinstein & Riley, P.S ("W&R") and William S.

19   Weinstein (collectively, "Plaintiffs") were represented by John S. Riper and Zachary O.

20   McIssac of Ashbaugh Beal LLP.  Defendant/Counter-Claimaint Westport Insurance

21   Corporation ("Westport") was represented by Robert P. Conlon and Christopher A.

22   Wadley of Walker Wilcox Matousek LLP, and Curt H. Feig of Nicholl Black & Feig,

ORDER- 1

1  PLLC.  The court has considered the testimony presented at trial, the exhibits admitted

2  into evidence, and the arguments of counsel.  The court has weighed the testimony,

3  exhibits, and evidence using the required "preponderance of the evidence" standard.

4  Now the court, being fully advised, makes its Findings of Fact and Conclusions of Law

5  as follows:

## I.   FINDINGS OF FACT

**A.   Credibility Determinations**

8      1.     The witnesses upon whom Plaintiffs relied to prove what occurred in the

9  Oregon lawsuit had reason to be biased in Plaintiffs' favor.

10         (a)     Because Mr. Weinstein is a plaintiff, he stands to gain financially

11      from Plaintiffs' claims.

12         (b)     Spencer Hall and Art Claflin are Mr. Weinstein's attorneys.  They

13      have had an attorney-client relationship with Mr. Weinstein since February 2006;

14      they presently represent him in at least one pending matter; Mr. Weinstein has

15      paid their law firm over $3 million over the course of their relationship; and Mr.

16      Hall testified that he hoped to charge Mr. Weinstein for his time testifying in this

17      case.

18      2.     The witnesses upon whom Westport relied—Peter Ehrlichman (B-Line,

19  LLC's counsel), Michael Simon (Lone Star U.S. Acquisitions, LLC's counsel), and

20

21

22

ORDER- 2

1   James Lico[1] (Golden Gate Capital LLC's counsel)—had no relationship with Westport

2   and did not have any stake in the outcome of this litigation.

3       3.      Thus, to the extent that the witnesses' testimony conflicts with regard to

4   whether activities occurred in the Oregon lawsuit that were related to B-Line's "failure to

5   withdraw" claim, and with regard to the valuation of Plaintiffs' claims at settlement, the

6   court credits the testimony of Westport's witnesses, rather than Plaintiffs' witnesses.

7   **B.      B-Line, LLC and the Oregon Lawsuit**

8       4.      Mr. Weinstein is a lawyer and the principal owner of W&R, a Seattle-based

9   bankruptcy law firm.  In the 1990s, W&R pioneered the practice of representing clients

10  with large portfolios of small receivables owned by debtors in bankruptcy.  W&R created

11  business software, computer modeling, and standardized accounting and legal procedures

12  that allowed institutional clients to realize greater amounts on their receivables portfolios

13  at lower costs than could be achieved by traditional representation in bankruptcy cases.

14      5.      In 1997, Mr. Weinstein and a group of investors founded B-Line, LLC ("B-

15  Line").  B-Line's purpose was to buy consumer receivables portfolios and provide

16  support services to W&R to realize recovery on its receivables and on the portfolios of

17  other W&R clients.  Mr. Weinstein was B-Line's largest shareholder (with a stake of

18  38%), served as its Chief Executive Officer ("CEO"), and controlled the company.

19      6.      B-Line's relationship with W&R was symbiotic: W&R provided B-Line

20  with legal services, and B-Line provided W&R with support services.  (Ex. A-3 (legal

21  _____

22      [1] Westport introduced Mr. Lico's testimony through a stipulation agreed upon by the
    parties.  (Lico Stip. (Dkt. # 146).)

1   services agreement between W&R and B-Line); Ex. A-4 (servicing agreement between

2   W&R and B-Line).)

3       7.      In 2003, Golden Gate Private Equity, Inc. ("Golden Gate"), a private equity

4   firm, invested $51 million in B-Line.  Golden Gate invested in B-Line through a holding

5   company named B-Line Holdings, LLC ("Holdings"), which acquired 39% of B-Line.

6   Mr. Weinstein continued to hold a 38% ownership interest in B-Line.  Mr. Weinstein also

7   remained B-Line's CEO and maintained control over its day-to-day operations.

8       8.      The Transfer Restriction and Liquidity Agreement governing Golden

9   Gate's investment in B-Line included a "Drag Along" provision, which specified that

10  Holdings could require all other shareholders in B-Line, including Mr. Weinstein, to sell

11  their B-Line stock for $100 million or more after two years if the company failed to meet

12  certain performance targets. (Ex. A-2 § 2.2(a).)

13      9.       B-Line did not meet its performance targets over the next two years, and

14  Holdings negotiated the company's sale to Lone Star U.S. Acquisitions, LLC ("Lone

15  Star") for $170 million.

16      10.     Mr. Weinstein, however, refused to sign the purchase agreement.

17  Consequently, on April 4, 2006, Holdings sued Mr. Weinstein in Oregon (the "Oregon

18  lawsuit"), seeking to compel him to participate in the sale.  (*See* Ex. A-7.)  Holdings also

19  sued Mr. Weinstein for damages, alleging that he breached fiduciary and contractual

20  duties and that he wrongfully frustrated Holdings' attempts to sell B-Line.  (*Id.*)  Lone

21  Star intervened in the Oregon lawsuit.  Like Holdings, Lone Star also sought an

22  injunction ordering Weinstein to participate in the sale.

11.     As an affirmative defense, Mr. Weinstein alleged that Holdings had wrongfully "impaired the [c]ompany's ability to meet the performance targets . . . and . . . prevented the parties from obtaining a fair price for their interests." (Ex. A-9, Affirmative Defenses ¶ 3.)  Mr. Weinstein also brought counterclaims for damages against Holdings, Golden Gate, and two Golden Gate directors.  Mr. Weinstein contended that officers of Golden Gate and B-Line had sabotaged his management of B-Line in order to impair its financial success, trigger the "Drag Along" provisions in the contract, and force Mr. Weinstein to sell his interest in the company for less than it was worth ("the 'forced sale' claim").  (Ex. A-9, Counterclaims ¶ 20.)

12.     In July and August 2006, the Oregon court held a two-week bench trial on Holdings' and Lone Star's claims for an injunction compelling Mr. Weinstein to sell his B-Line shares to Lone Star.  (Ex. A-10.)  At the conclusion of the bench trial, the court found that B-Line had failed to meet "[t]he bargained-for [c]ompany performance standards"; that the reasons the performance standards were not met were "within the bargained-for risk that Weinstein assumed";  that "[t]here [was] no bad faith that would justify denying relief to Holdings"; and that Lone Star's purchase price "exceed[ed] the $100 million minimum" that Mr. Weinstein had agreed upon and the $125 million threshold below which Mr. Weinstein would have been entitled to make a matching offer. (*Id.* ¶¶ 2-5.)  The court ordered Mr. Weinstein to participate in the sale.  (Ex. A-10; Ex. 33.)  The court retained jurisdiction over the parties' damages claims, which had not been part of the bench trial.  (Ex. 33.)

13.     The sale of B-Line to Holdings closed on September 19, 2006.  Mr. Weinstein testified that he received approximately $59 million for his share of the company.

14.     Because W&R depended upon B-Line's services in order to serve its clients, the court appointed a referee to oversee the separation of B-Line and W&R.  (Ex. 33 ¶ 8.)  From November 2006 through September 2007, Mr. Weinstein and Lone Star participated in a number of hearings and filed a series of motions before the Oregon referee.  (*See, e.g.*, Exs. A-11, A-12, A-14, A-15, A-16, A-18, A-19, A-20; A-22.)

15.     In November 2006, B-Line (now owned by Lone Star) notified Plaintiffs that it was terminating its attorney-client relationship with them.  (Ex. A-13.)  B-Line stated that it would "provide substitute counsel for all matters where [W&R] is currently representing B-Line in any bankruptcy court proceeding."  (*Id.*)

16.     At a hearing before the referee on April 17, 2007, the parties discussed the fact that, although B-Line had terminated Plaintiffs as its attorneys in November 2006, W&R continued to be listed as B-Line's agent on the Proof of Claim ("POC") and Transfer of Claim ("TOC") forms that B-Line had filed in bankruptcy proceedings.  (Ex. A-17.)

17.     B-Line advised the referee that it was filing the forms necessary to withdraw W&R as its agent, but that it also believed that it was legally Plaintiffs' responsibility, under Washington law, to file the forms.  (*Id.*)  Plaintiffs, meanwhile, took the position that B-Line had the contractual responsibility to file the forms under the servicing agreements between W&R and B-Line.  Nevertheless, B-Line told the referee

1   that it was filing the TOC and POC forms because it had the systems and capability to do

2   so.  (Ex. A-17.)

3        18.   Lone Star's counsel, Mr. Simon, testified that Plaintiffs' withdrawal as B-

4   Line's agent was "one of a dozen minor issues" discussed during the April 17, 2007

5   hearing, and Plaintiffs' counsel, Mr. Claflin, testified that the topic was never again

6   raised in any subsequent hearings before the referee.  In addition, the parties did not file

7   any motions before the referee that pertained to Plaintiffs' withdrawal from the

8   bankruptcy cases.

9        19.   By September 2007, Plaintiffs stated that W&R's separation from B-Line

10  was "substantially complete[]." (Ex. A-23 at 2.)

11       20.   On September 28, 2007, Mr. Weinstein filed a brief in the Oregon lawsuit

12  in opposition to his adversaries' motion to terminate the services of the referee.  (Ex. A-

13  23.)  Mr. Weinstein identified in his brief the remaining issues to be resolved by the

14  referee concerning W&R's and B-Line's separation.  The brief does not discuss

15  Plaintiffs' withdrawal from bankruptcy cases as one of the remaining issues.

16       21.   By October 8, 2007, W&R was independent and capable of operating

17  without B-Line, and W&R had acquired the technology and infrastructure necessary to

18  prepare and file POC and TOC forms on its own.

19  **C.   B-Line Files the Washington Lawsuit and Plaintiffs' Tender  the Washington
        Lawsuit to Westport**

20

21       22.   In late summer 2007, Lone Star hired the law firm Dorsey & Whitney to

22  represent B-Line.  Shortly thereafter, on September 12, 2007, B-Line filed a separate

1  lawsuit in Washington, asserting three causes of action against Plaintiffs (the

2  "Washington lawsuit").  (Ex. 2.)

3       23.    In its first cause of action, for malpractice against Mr. Weinstein and W&R,

4  B-Line alleged that Plaintiffs caused it to sustain damages by (a) negotiating a legal

5  services agreement that paid W&R $1.5 million per year; (b) extracting an interest-free

6  "advance" of $190,000; (c) demanding a $1.5 million termination fee after B-Line

7  terminated its attorney-client relationship with W&R; (d) engaging in certain practices

8  until the court-ordered sale of B-Line, such as Weinstein installing himself as B-Line's

9  chief legal officer and refusing to respond to a subpoena issued to B-Line; and (e) failing

10  to withdraw as B-Line's counsel of record in bankruptcy cases after B-Line terminated

11  the attorney-client relationship.  (Ex. 2 ¶¶ 59-64.)

12       24.    In its second cause of action, for malpractice against Mr. Weinstein, B-Line

13  alleged that Mr. Weinstein caused it damages by (a) representing B-Line as its chief legal

14  officer in connection with the Oregon lawsuit; and (b) engaging in certain practices until

15  B-Line's sale.  (Ex. 2 ¶¶ 68-70.)

16       25.    In its third cause of action, for breach of fiduciary duty against Mr.

17  Weinstein, B-Line alleged that Mr. Weinstein breached fiduciary duties that he owed to

18  the company in his capacity as president and CEO and caused B-Line to sustain damages

19  by (a) usurping B-Line's business opportunities; (b) negotiating the legal services

20  agreement; (c) allowing himself to serve as B-Line's chief legal officer in the Oregon

21  lawsuit; and (d) ordering B-Line to pay W&R an interest-free "advance" of $190,000.

22  (Ex. 2 ¶¶ 73-78.)

1    26.    B-Line later amended its complaint to include a fourth cause of action,

2 seeking damages for W&R's alleged failure to (a) pay B-Line for services rendered; (b)

3 return the $190,000 "advance"; and (c) return funds allegedly held by W&R in trust.  (Ex.

4 A-25 ¶¶ 83-85.)

5    27.    B-Line mentioned the Oregon lawsuit in several of its factual allegations in

6 its complaint.  (Ex. 2.)  For example, the complaint alleged that Holdings had sued Mr.

7 Weinstein to enforce its drag-along rights (*id.* ¶ 34); that Holdings had subpoenaed B-

8 Line for documents in the Oregon lawsuit (*id.* ¶ 35); that Holdings successfully moved to

9 recuse Mr. Weinstein from representing B-Line with respect to the subpoena (*id.* ¶¶ 37-

10 39); and that the Oregon trial court had ordered all members of B-Line to sell their

11 interest in the company to Lone Star (*id.* ¶ 43).

12    28.    W&R had purchased a professional liability insurance policy ("the Policy")

13 from Westport shortly after B-Line was sold.  (Ex. 13.)  The Policy provided lawyers

14 professional liability coverage for claims made and reported against W&R and its

15 attorneys, including Mr. Weinstein, during the policy period of October 8, 2006 to

16 October 8, 2007.  (Ex. 1, Declarations § C.)

17    29.    Plaintiffs tendered the Washington lawsuit to Westport by Federal Express

18 on September 14, 2007.  (Exs. 3, 5.)  One of Plaintiffs' attorneys in the Oregon lawsuit,

19 Mr. Claflin, drafted the cover letter by which Plaintiffs tendered the Washington lawsuit

20 to Westport.  (Ex. A-77.)  The tender letter did not mention the Oregon lawsuit or include

21 any request for coverage of activities occurring in the Oregon lawsuit.  (Ex. 2.)  The

22 tender enclosed only the complaint that B-Line had filed against Plaintiffs in the

1  Washington lawsuit; it did not include any pleadings or other documents from the Oregon

2  lawsuit.  (*Id.*)

3       30.    On September 27, 2007, Westport's claims adjuster, Michael Hultquist,

4  sent Plaintiffs an acknowledgement that Westport had received Plaintiffs' tender.  (Ex.

5  4.)  Mr. Hultquist faxed the acknowledgement to (206) 269-3489.  (*Id.*)

6       31.    After receiving the Washington tender, Mr. Hultquist evaluated B-Line's

7  complaint, compared B-Line's allegations with the terms of the policy, and arranged a

8  telephone call with Mr. Weinstein and W&R's managing director, Richard Welt, to

9  discuss the matter.  (Hultquist Dep.)

10       32.    On October 2, 2007, Mr. Weinstein's assistant contacted Mr. Hultquist to

11  confirm the telephone conference.  The assistant told Mr. Hultquist that the correct fax

12  number for Plaintiffs was (206) 269-3493.  (Ex. 32.)

13       33.    The telephone conference took place on October 3, 2007.  Mr. Weinstein

14  advised Mr. Hultquist that the Washington lawsuit was duplicative of ongoing litigation

15  in Oregon, that the Washington claims were B-Line's effort at forum-shopping, and that

16  B-Line was attempting to relitigate the Oregon court's decisions in Washington.  (Ex.

17  32.)  Mr. Weinstein did not request Westport's participation in any proceedings before

18  the Oregon court.  (Hultquist Dep.)

19       34.    Mr. Hultquist initially concluded that B-Line's claims were not covered

20  because they either did not arise out of Plaintiffs' rendition of legal services, or they arose

21  out of excluded acts, including legal services that Plaintiffs rendered while Mr. Weinstein

22

ORDER- 10

1  owned more than 5% of B-Line and controlled B-Line.  (*Id.*)  Mr. Hultquist informed Mr.

2  Weinstein of this initial conclusion.

3      35.    Before Westport could issue a denial of coverage, however, Mr. Hultquist

4  was required to discuss the claim with his immediate supervisor and with Westport's

5  head of claims.  (*Id.*)  Mr. Hultquist advised Mr. Weinstein that no denial would be issued

6  until he received approval from the two supervisory layers above him, and invited Mr.

7  Weinstein to submit any additional documentation that he wanted Westport to consider in

8  making its coverage decision.  (Hultquist Dep.)

9      36.    On October 4, 2007, Plaintiffs sent Westport a follow-up letter.  (Ex. 6.)

10  The letter did not reference the Oregon lawsuit or request any coverage for the Oregon

11  lawsuit.  (*Id.*)  The letterhead stated that Plaintiffs' fax number was (206) 269-3489—not

12  (206) 269-3493, the number Mr. Weinstein's assistant had given Mr. Hultquist.  (*Id.*)

13      37.    Mr. Hultquist conducted no further investigation of Plaintiffs' insurance

14  claim after the October 3, 2007 telephone call.  Mr. Hultquist testified that he did not

15  investigate the Oregon lawsuit further because he determined, after speaking with Mr.

16  Weinstein, that there were no potentially-covered claims in the Oregon lawsuit.  Mr.

17  Hultquist also testified that because there were no covered claims in Oregon, it did not

18  matter to his coverage determination whether any of the activities in the Oregon lawsuit

19  were related to the claims in the Washington lawsuit.  (Hultquist Dep.)

20      38.    After Mr. Hultquist discussed the matter with his supervisors, Westport

21  decided to retain outside coverage counsel to evaluate the claim and provide a coverage

22  opinion before issuing a formal coverage decision.  (*Id.*)  Westport's coverage counsel,

1  Robert Conlon, provided his opinion on November 1, 2007.  (Ex. 32.)  After receiving

2  Mr. Conlon's opinion, Westport decided not to deny coverage outright, but instead

3  offered to defend Plaintiffs under a reservation of rights because it determined that one of

4  B-Line's claims was potentially covered.  (Hultquist Dep.; Ex. 10.)

5      39.     Mr. Hultquist testified that once he retained outside coverage counsel for

6  Plaintiffs' claim, he relied on coverage counsel to investigate the claim, to gather

7  information, to make valuations, and to provide advice.  Mr. Hultquist continued,

8  however, to review the communications between coverage counsel and Plaintiffs.

9      40.     Westport did not communicate anything to Plaintiffs between Mr.

10  Hultquist's October 3, 2007 call to Mr. Weinstein and December 12, 2007, when Mr.

11  Hultquist left a message for Plaintiffs.  (Ex. 32; Hultquist Dep.)  There is no evidence of

12  any other activity by Westport on Plaintiffs' claim between November 1, 2007, and

13  December 12, 2007.

14      41.     Westport issued its reservation-of-rights letter on December 12, 2007.  (Ex.

15  10.)  Westport explained that B-Line's claim for damages based on Plaintiffs' alleged

16  failure to withdraw as B-Line's counsel from the bankruptcy cases after B-Line

17  terminated its attorney-client relationship with W&R—one of the bases for B-Line's

18  malpractice claim in its first cause of action—potentially triggered coverage.  (*Id*. at 5-

19  8.)  Westport also informed Plaintiffs, however, that the remaining claims were not

20  covered by the policy, either because the claims did not arise out of the rendition of legal

21  services or arose out of legal services provided on behalf of an entity that was either

22

1 | controlled, managed, or operated by Mr. Weinstein or was five percent or more owned by

2 | Mr. Weinstein (the "equity interest exclusion").  (*Id.*)

3 |     42.    Westport pointed out that B-Line did not specify what damages it sustained

4 | based on Plaintiffs' alleged failure to withdraw, and Westport explained that it would not

5 | cover B-Line's claim to the extent that B-Line sought to recover payments Plaintiffs

6 | received, but which belonged to B-Line.  (*Id.* at 6.)

7 |     43.    Westport retained Joel Wright of the law firm Lee Smart, P.S., Inc., to

8 | defend Plaintiffs.  (*Id.* at 8-9.)  Westport stated that it was only obligated to defend

9 | Plaintiffs against B-Line's single potentially-covered claim, rather than B-Line's entire

10 | complaint.  (*Id.* at 8.)  Accordingly, Westport reserved the right to allocate expenses

11 | between those that Plaintiffs incurred in defending against the potentially-covered claims

12 | and those incurred in defending against non-covered claims.  (*Id.*)

13 |     44.    Westport also reserved the right to deny indemnity for loss that was not

14 | covered by the Policy.  (*Id.* at 8-9.)   Because only one claim was potentially covered,

15 | Westport reserved the right to allocate any judgment or settlement liability incurred by

16 | Plaintiffs.  (*Id.* at 8.)  Westport advised Plaintiffs that any settlement they entered into

17 | should "be clearly and reasonably apportioned between the various claims asserted by B-

18 | Line" so that the parties could determine what loss, if any, was covered under the policy.

19 | (*Id.*)

20 |     45.    Westport also requested additional information from Plaintiffs if they

21 | believed that Westport's coverage determinations were in error, Westport had

22 | misunderstood any of the relevant facts, or there was a change in circumstances, such as

ORDER- 13

1  the filing of amended complaints or the disclosure of additional facts, that could impact

2  Westport's coverage analysis.  (*Id.* at 9.)

3      46.    Westport faxed its reservation-of-rights letter to (206) 269-3489, which was

4  identified as W&R's fax number in Plaintiffs' October 4, 2007 letter to Westport.  (Ex. 6;

5  Ex. 10; Ex. 11.)  That fax number, however, belonged to B-Line following the court-

6  ordered sale.  (Ex. 10 at 1; Ex. 11.)  Nevertheless, Plaintiffs were not prejudiced by B-

7  Line's receipt of the reservation-of-rights letter.  Mr. Ehrlichman, B-Line's counsel,

8  testified that B-Line did not use the information contained in the letter to avoid triggering

9  insurance coverage for the claims it pleaded against Plaintiffs.  In addition, reservation-

10  of-rights letters are discoverable in Washington.  *See* Wash. CR 26(b)(2).

11      47.    Mr. Wright sent Mr. Weinstein a letter regarding his appointment as

12  counsel for Plaintiffs by Westport.  (Ex. 12.)  Mr. Wright noted that he had spoken with

13  Mr. Hall, Mr. Weinstein's counsel, who had requested for strategic reasons that Mr.

14  Wright not substitute in as counsel in the Washington lawsuit at that time.  (*Id.*)  In

15  addition, Plaintiffs' insurance coverage counsel, Richard Beal, advised Mr. Weinstein not

16  to sign an engagement letter that Mr. Wright had sent to Mr. Weinstein.  (Exs. 12, 17, 32,

17  A-28.)

18  **D.    Plaintiffs Allege Bad Faith By Westport; Plaintiffs and Westport Mediate**

19      48.    On January 15, 2008, Mr. Beal, sent a letter to Westport and Mr. Wright in

20  which he accused Westport of breaching the Policy and acting in bad faith.  (Ex. 15.)

21  Plaintiffs' primary basis for accusing Westport of bad faith was Westport's selection of

22  Mr. Wright to defend them in the Washington lawsuit.  (*Id.* at 1-3.)  Plaintiffs argued that

1   Mr. Wright had a conflict of interest and that they were entitled to select their own

2   counsel.  (*Id.* at 1-3.)

3        49.    In their January 15, 2008 letter, Plaintiffs also demanded, for the first time,

4   that Westport pay expenses they incurred in the Oregon lawsuit.  (*Id.* at 3; Hultquist

5   Dep.)  Plaintiffs claimed that Westport had to reimburse them for expenses they incurred

6   in the Oregon lawsuit that were "reasonably related" to Plaintiffs' defense of the "failure

7   to withdraw" claim that B-Line had asserted against them in the Washington lawsuit.

8   (*Id.*)  Plaintiffs also advised Westport that the Washington lawsuit had been stayed at

9   their request.  (Hultquist Dep.)

10        50.    Westport's and Plaintiffs' coverage attorneys discussed the issues raised by

11   Plaintiffs and, in response to Plaintiffs' request, Westport instructed Mr. Wright to take

12   no further action in the case.  (Exs. 19, A-28, A-29, A-31.)

13        51.    In light of Plaintiffs' demand for reimbursement of their expenses in the

14   Oregon lawsuit, Westport requested documentation from Plaintiffs regarding the

15   relationship between the Oregon and Washington lawsuits.  In response, on February 1,

16   2008, Plaintiffs sent Westport over 1,000 pages of documents, including the motion to

17   stay that Plaintiffs filed in the Washington lawsuit, as well as pleadings, motions, and

18   hearing transcripts from the Oregon lawsuit.  (Ex. A-30.)

19        52.    At the time, the Oregon lawsuit was primarily a dispute between Holdings /

20   Lone Star and Mr. Weinstein – neither B-Line nor W&R were parties to the Oregon

21   lawsuit.  (*See, e.g.*, Ex. A-30 at WIC 4788.)  Rather, B-Line was an asset that was the

22   subject of the dispute between Lone Star and Mr. Weinstein.

1    53.    The only reference to the "failure to withdraw" issue in the documents

2  Plaintiffs sent on February 1, 2008, was the brief colloquy that occurred before the

3  referee on April 17, 2007, five months before B-Line filed its malpractice claims against

4  Plaintiffs.  (Ex. A-30 at WIC 04232.)  The documents did not include evidence of any

5  additional litigation related to B-Line's "failure to withdraw" claim or any other

6  potentially-covered claims.  (Ex. A-30.)

7    54.    In a letter dated February 29, 2008, Westport advised Plaintiffs that because

8  the Washington lawsuit had been stayed, there was nothing to be done in defense of the

9  claims B-Line asserted in that lawsuit.  Accordingly, Westport had instructed Mr. Wright

10  not to take any further action in the case.  Westport reserved the right to revist the defense

11  of the Washington lawsuit if the stay was lifted, and asked Plaintiffs to notify it if the stay

12  was lifted or any other activity occurred in the case.  (Ex. A-31 at 1.)  Accordingly, Mr.

13  Wright never filed an appearance in either the Washington lawsuit or the Oregon lawsuit,

14  and Plaintiffs were always represented by counsel of their choice in both lawsuits.

15    55.    In its February 29, 2008 letter, Westport also acknowledged its

16  responsibility to pay all "reasonable and necessary" expenses Plaintiffs incurred

17  defending against B-Line's "failure to withdraw" claim, and it requested billing

18  statements and invoices detailing Plaintiffs' expenses.  (*Id.* at 2.)  Westport told Plaintiffs

19  that it had reviewed the information Plaintiffs had provided, and that it did not appear that

20  the Oregon lawsuit involved any claims that were potentially covered under the Policy.

21  (*Id.*)  Westport nevertheless advised Plaintiffs that they should forward any information

22

1   to Westport that they believed evidenced litigation of a covered claim in the Oregon

2   lawsuit.  (*Id.*)

3       56.    There was no further communication between Plaintiffs and Westport until

4   June 24, 2008.  (Hultquist Dep.)  Then, in a letter dated June 24, 2008, Plaintiffs

5   demanded payment of attorney's fees totaling nearly $500,000, constituting about 60% of

6   the expenses they had incurred between September 2007 and May 2008 in both the

7   Oregon and Washington lawsuits.  (Ex. 20.)  Plaintiffs contended that these fees were

8   "reasonably related" to the defense of the potentially-covered "failure to withdraw" claim

9   under *Nordstrom, Inc. v. Chubb & Son, Inc.*, 820 F. Supp. 530, 536 (W.D. Wash. 1992),

10  *aff'd*, 54 F.3d 1424 (9th Cir. 1995), in which the court observed that "[n]o right of

11  allocation [of defense costs] exists for the defense of non-covered claims that are

12  "reasonably related" to the defense of covered claims."[2]  (*Id.*)  Plaintiffs included with

13  their letter highlighted invoices from both Hall Zanzig Zulauf Claflin McEachern ("Hall

14  Zanzig"), Plaintiffs' primary law firm, and Stoll Stoll Berne Lokting & Shlachter, P.S.

15  ("Stoll Berne"), Plaintiffs' Oregon law firm.  (*Id.*)  Plaintiffs did not, however, explain

16  how they determined which billing entries were "reasonably related" to the defense of the

17  stayed "failure to withdraw" claim.  (*Id.*)  In addition, most of the entries were "block-

18  billed," rather than separated into the time expended on each activity.  (*Id.*)

19  _____

20      [2] *Nordstrom* involved the allocation of defense expenses between Nordstrom's directors
    and officers, who were insured under a directors' and officers' ("D&O") liability insurance and

21  Nordstrom, which was not insured under the policy.  Observing that Nordstrom's liability was
    wholly deriviative of the directors' and officers' liability, the *Nordstrom* court denied the

22  insurers' request for additional discovery regarding allocation of defense expenses.  *Nordstrom*,
    820 F. Supp. at 536-537.

57.     Westport evaluated Plaintiffs' invoices and separated the expenses that related to the Washington lawsuit, where a potentially-covered claim had been pleaded against Plaintiffs, from those that related to the Oregon lawsuit, where Westport believed that no covered claim was being litigated and there was no evidence of any activity that was related to the defense of B-Line's "failure to withdraw" claim.  (Ex. 23.)

58.     In a letter to Plaintiffs dated July 28, 2008, Westport acknowledged that it was obligated to reimburse Plaintiffs for "reasonably related" attorney's fees under the standard in *Nordstrom*.  (Ex. 23.)  Westport explained that it remained unaware of any litigation of a covered claim in the Oregon lawsuit and, therefore, it did not have a duty to defend Plaintiffs in the Oregon lawsuit or pay for any of their expenses in that lawsuit. (Ex. 22; Ex. 23 at 3-6.)

59.     Westport offered to pay Plaintiffs $151,742.50, which constituted the entirety of the expenses Plaintiffs had incurred in the Washington lawsuit.  (Ex. 23 at 6.) Westport pointed out that, while it only had a duty to defend Plaintiffs against B-Line's single potentially-covered claim, rather than the entire Washington lawsuit, it would nevertheless pay all of Plaintiffs' expenses in that lawsuit if they agreed to accept the payment in satisfaction of their claim for past expenses.  (*Id.* at 5-6.)  Alternatively, Westport explained that, if Plaintiffs demanded additional reimbursement, they would have to provide more information about their alleged expenses, including evidence that they were, in fact, litigating a covered claim in the Oregon lawsuit.  (*Id.* at 6-7.)

60.     Plaintiffs rejected Westport's offer, instead demanding that Westport pay them the entire amount it had offered and mediate the rest of their claim. (Exs. 24, 25, A-35, A-36.)  Plaintiffs also sued Westport in King County Superior Court.  (Ex. A-37.)

61.     Westport agreed to pay Plaintiffs $151,742.50 and to mediate the rest of their claim, in exchange for Plaintiffs' dismissal of their lawsuit without prejudice. (Ex. 26; Ex. 27; Ex. A-42.)  Westport, however, reserved the right to recover expenses that were not related to the potentially-covered claim if a judicial officer determined that it was entitled to those expenses.  (Ex. 27.)

62.     On September 30, 2008, Westport sent Plaintiffs a check for $151,742.50 per their agreement to mediate.  (Ex. A-42.)

63.     The parties mediated on November 20, 2008, but were unsuccessful at coming to an agreement.  (Hultquist Dep.; Ex. A-49.)  Shortly thereafter, Plaintiffs filed the instant lawsuit.

**E.     Plaintiffs File Third-Party Claims against B-Line in the Oregon Lawsuit; B-Line Later Files Malpractice Claims**

64.     In the meantime, Westport continued to communicate with Plaintiffs' attorneys, Mr. Hall and Mr. Claflin, who provided Westport with numerous pleadings, motions, and hearing transcripts produced in the Oregon litigation.  (Exs. A-44, A-45, A-46, A-47, A-49, A-51, A-53, A-54, A-55, A-56, A-63.)  Westport reviewed and responded to the emails as they were sent.  (*See id.*)

65.     On July 29, 2008, Plaintiffs filed a Fourth Amended Answer and Third Party Complaint ("4th Amended Answer") in the Oregon lawsuit.  (Ex. A-39.)  The 4th

1   Amended Answer for the first time introduced B-Line as a party to the Oregon lawsuit.

2   (*Id.*)  The 4th Amended Answer was 52 pages in length, contained 330 separate

3   paragraphs, and asserted 15 "claims for relief" against 10 different parties.  (*Id.*)  In

4   Paragraph 319 of their 14th claim for relief, Plaintiffs requested that the Oregon court

5   resolve the claims B-Line had filed against them in the Washington lawsuit:

> 319.  On September 12, 2007, B-Line filed a duplicative lawsuit in King
> County Superior Court in the State of Washington.  In the Washington
> lawsuit, B-Line asserted claims regarding all the monetary disputes pending
> in the Oregon lawsuit and asserted that those claims were affected by
> malpractice and breaches of fiduciary duty by Weinstein and Weinstein &
> Riley.  On October 30, 2007, B-Line filed a motion in the Washington
> lawsuit to disqualify Weinstein & Riley's legal counsel.  On November 15,
> Weinstein & Riley filed a motion in the Washington lawsuit to dismiss or
> stay the Washington lawsuit pending resolution of this lawsuit.  On
> December 21, 2007, the Washington court denied B-Line's motion to
> disqualify Weinstein & Riley's legal counsel and stayed the Washington
> lawsuit pending resolution of this lawsuit on the ground that the
> Washington lawsuit was duplicative.  Weinstein and Weinstein & Riley ask
> that B-Line's allegations of malpractice and breaches of fiduciary duty be
> resolved in this action.

14  (*Id.* ¶ 319.)  Plaintiffs' 4th Amended Answer was the first time that any pleading in the

15  Oregon lawsuit referenced, however indirectly, the potentially-covered malpractice

16  claim.

17          66.    On August 7, 2008, Holdings and Golden Gate moved to dismiss the 4th

18  Amended Answer on pleading grounds; B-Line joined in their motion.  (Ex. A-47.)

19  Neither the motion to dismiss nor B-Line's joinder mentioned the failure to withdraw

20  claim.  (*Id.*)  Plaintiffs filed a single response (the "omnibus response") to the motions.

21  (Ex. 35.)  The single paragraph addressing the motions to dismiss Plaintiffs' 14th claim

22  for relief does not mention either the Washington lawsuit or any malpractice claims.  (Ex.

35 at 23-24.)  B-Line's reply similarly refers to the 14th claim for relief only in general terms and only with respect to the individual defendants.  (Ex. A-47.)

67.    On September 4, 2008, the Oregon court held oral argument on the motion to dismiss.  (Ex. A-45 at WIC 3331 *et seq.*.)  The court granted the motion to dismiss, but granted Plaintiffs leave to re-plead.  (*Id.*)  The transcript contains no reference to any malpractice claim or to Plaintiffs' fourteenth claim for relief.  (*Id.*)  Shortly thereafter, on September 9, 2008, Plaintiffs emailed Westport the dismissed 4th Amended Answer. (Ex. A-39.)  Plaintiffs told Westport that this pleading "referenc[ed] the malpractice claims."  (*Id.*)

68.    On September 12, 2008, Westport again requested the same information it had asked for in its July 28, 2008 letter.  (Ex. A-40.)  Westport noted that the 4th Amended Answer contained only affirmative claims against B-Line rather than any potentially-covered claim against Plaintiffs.  (*Id.*)  Westport requested additional information, including B-Line's response to Plaintiffs' pleading, to determine whether B-Line's malpractice claims were, in fact, being litigated in the Oregon lawsuit.  (Exs. A-40, A-44.)

69.    On September 12, 2008, Plaintiffs filed their Fifth Amended Answer and Third-Party Complaint ("5th Amended Answer") in the Oregon lawsuit.  (Ex. 34.) Paragraph 333 of the 5th Amended Answer, now within Plaintiffs' tenth claim for relief, contains the same text as ¶ 319 of the 4th Amended Answer.  (*Id.*)  On September 25, 2008, B-Line moved to dismiss Plaintiffs' claim for resolution of the Washington malpractice and fiduciary duty claims as not properly pleaded.  (Ex. A-41.)  B-Line

asserted that ¶ 333 was not a proper allegation, and that it was improper for Plaintiffs to attempt to force B-Line to assert the stayed claims in the Oregon lawsuit. (*Id.*) Plaintiffs' response to B-Line's motion includes no reference to ¶ 333. (Ex. A-45.)

70.    On December 10th, 2008, Plaintiffs filed their Sixth Amended Answer and Third Party Complaint ("6th Amended Answer") in the Oregon court. (Ex. A-36.) In ¶ 239, Plaintiffs again included the same text that appeared in ¶ 319 of the 4th Amended Answer and ¶ 333 of the 5th Amended Answer. (*Id.* ¶ 239.)  However, in the 14th claim for relief in the 6th Amended Answer, Plaintiffs added claims for declaratory judgment against Lone Star and B-Line. Specifically, Count 2 of the 14th claim for relief alleged:

> Weinstein and Weinstein & Riley are entitled to a declaration that the claim for malpractice, breach of fiduciary duty, breach of contract and for monies owed asserted by B-Line, LLC in an action brought in King County, Washington, before that action was stayed, are without merit[.]

(*Id.* ¶ 408.)

71.    On January 16, 2009, B-Line filed an answer and counterclaims to Plaintiffs' third-party claims in the Oregon lawsuit. (Ex. 37.)  B-Line denied Plaintiffs' allegations, and, for the first time, asserted claims against Plaintiffs in the Oregon lawsuit. (*Id.* ¶¶ 138-146.)  Although B-Line's third cause of action asserted claims of malpractice against Plaintiffs, none of B-Line's claims mentioned Plaintiffs' alleged "failure to withdraw" as a wrongful act supporting liability for the claims. (*Id.*) According to B-Line's attorney, Mr. Ehrlichman, B-Line had by this time abandoned its claim for damages based on Plaintiffs' alleged "failure to withdraw."

1   72.   On January 26, 2009, Mr. Hall drafted a summary of B-Line's claims for

2   Mr. Weinstein.  (Ex. A-57.)  Mr. Hall's summary did not include any allegations

3   regarding malpractice for failure to withdraw.  The document does include a line-item

4   stating that "Weinstein owes B-Line for services under Attachments D (bankruptcy

5   notification) and E (filing proofs of claims) of the Servicing Agreement after the sale of

6   B-Line."  (*Id.*)  This item, however, reflects a contractual dispute between Plaintiffs and

7   B-Line regarding the obligation to pay for filing proofs of claims rather than an allegation

8   of damages arising from Plaintiffs' malpractice.

9   73.   In February 2009, Avalon Financial Services, LLC f/k/a NOB, LLC

10  ("NOB") and Roundup Funding, LLC ("Roundup"), two subsidiaries of B-Line,

11  intervened in the Oregon lawsuit and filed complaints against Plaintiffs.  (Exs. A-59, A-

12  60.)  Plaintiffs provided Westport with B-Line's counterclaim and NOB's complaint (but

13  not Roundup's complaint).  (Exs. A-55, A-56, A-63.)

14  74.   On February 18, 2009, B-Line filed an amended answer to Plaintiffs' Sixth

15  Amended Answer and Third Party Complaint.  (Ex. A-62.)  B-Line's allegations in its

16  third cause of action remained unchanged.  Plaintiffs sent the amended answer to

17  Westport on February 23, 2009.  (Ex. A-63.)

18  75.   On March 13, 2009, Westport notified Plaintiffs that it found no

19  potentially-covered claims in the B-Line and NOB counterclaims, and that it was

20  therefore denying that it had a duty to defend Plaintiffs against those claims.  (A-68.)

21  Plaintiffs did not respond to Westport's letter.

22

**F.      Global Settlement of Claims**

76.      On March 20, 2009, the parties entered into a global settlement of all claims of all 21 parties to the Oregon and Washington lawsuits.  (Ex. 40.)   Plaintiffs forwarded the settlement agreement to Westport on May 1, 2009.  (Ex. A-73.)

77.      The parties did not attribute any value to Plaintiffs' "forced sale" claim during negotiations or in the settlement agreement.

a.      The settlement agreement did not apportion any particular value or consideration to any of the claims that the parties agreed to release.  (Ex. 40.)

b.      Both Plaintiffs' attorney, Mr. Hall, and Plaintiffs' adversaries' attorneys, Mr. Lico, Mr. Simon, and Mr. Ehrlichman, testified that neither the settlement agreement itself nor the negotiations leading up to it allocated the consideration given by any of the parties to individual claims or attributed any particular value to any of the released claims.  Specifically, Mr. Weinstein's adversaries did not attribute any settlement value to Plaintiffs' "forced sale" claim because they believed it had no merit and did not consider it to be a serious claim.

c.      Although Plaintiffs' attorneys, Mr. Hall and Mr. Claflin, testified that Mr. Weinstein would likely have recovered between $10 and $20 million on his "loss of control" claim had it gone to trial, their opinions were not supported by competent evidence.  Plaintiffs' attorneys did not perform their own valuation of Mr. Weinstein's claim, but instead based their assessment of Mr. Weinstein's alleged damages on two sources:  (1) Mr. Weinstein's own estimates of B-Line's alleged value, which Mr. Weinstein had figured out in his head, and (2) certain

1   documents produced by Lone Star in discovery, but which the court precluded

2   Plaintiffs from using at trial because they did not timely move to use the

3   documents pursuant to the parties' protective order.  In addition, while Plaintiffs

4   testified that they had retained an expert to evaluate Mr. Weinstein's claim, the

5   expert had not performed any calculations of the claim's value at the time the case

6   was settled.

7         d.    On March 23, 2009, Mr. Hall wrote a memorandum summarizing

8   the settlement with respect to Mr. Weinstein.  (Ex. A-70.)  The memorandum does

9   not describe any allocation of consideration to any of the claims at issue in the

10   litigation.

11         e.    On April 29, 2009, Mr. Hall wrote a letter summarizing the receipts

12   and disbursements.  (Ex. A-72.)  The letter does not describe any allocation of

13   consideration to any claims at issue in the litigation.

14         78.    In addition, Plaintiffs incurred no financial liability as a result of the

15   settlement.  Plaintiffs agreed to release certain funds that W&R had been holding under a

16   claimed attorney lien.  (Ex. 40 § 1(a)-(d).)  Plaintiffs received over $4.7 million in cash,

17   as well as the right to collect certain accounts receivable (referred to by the parties as

18   "Bluebook Accounts") that the parties valued at approximately $1 million at the time of

19   settlement.  (Ex. 40 § 1(a), (b), (d); Ex. A-70, Ex. A-72.)

20         79.    Because B-Line had abandoned its "failure to withdraw" claim as discussed

21   above, the court is not persuaded by Plaintiffs' contention that they were exposed to

22   liability based on this claim.

80.     The court also is not persuaded that Mr. Weinstein was forced to settle because was he financially unable to continue prosecuting his claims.  Mr. Weinstein had a personal financial worth of over $80 million at the time of the settlement.  (Ex. A-34.) Additionally, Mr. Weinstein testified regarding a number of reasons motivating him to settle the Washington and Oregon lawsuits, including the following:

a.     The litigation was having a disruptive impact on Mr. Weinstein's ability to finance Ophrys, LLC, a separate business that he had created following B-Line's sale;

b.     The litigation was having an enormous impact on Mr. Weinstein's ability to close several major transactions;

c.     The litigation was causing issues with Mr. Weinstein's existing banking relationships;

d.     The litigation was enormously time consuming and disruptive of both Mr. Weinstein's personal life and W&R's resources; and

e.     The litigation was jeopardizing a critical $200 million line of credit that Mr. Weinstein had solicited.

**G.     Facts Relevant to Plaintiffs' Oregon Attorney's fees**

81.     In support of their claim for reimbursement of fees incurred in the Washington and Oregon lawsuits, Plaintiffs introduced into evidence billing statements in which their attorneys, Mr. Hall and Mr. Claflin, highlighted approximately $1.8 million in fees that they claimed were "reasonably related" to Plaintiffs' defense of B-Line's "failure to withdraw" claim.  (Ex. 20; Ex. 41.)

82.     Mr. Hall and Mr. Claflin testified that they highlighted each billing entry that represented a service they believed they would have performed had they been retained to defend Plaintiffs against B-Line's "failure to withdraw" claim.  Mr. Hall and Mr. Claflin testified, however, that when they highlighted their billing statements they did not attempt to determine which services would have been rendered by reasonably competent counsel engaged to defend a suit against Plaintiffs that arose out of the same factual background, but which alleged *only* B-Line's "failure to withdraw" claim.

83.     Additionally, Plaintiffs' attorneys did not attempt to allocate time spent in connection with particular services that was related to issues that were relevant to Plaintiffs' defense of B-Line's "failure to withdraw" claim as opposed to time spent on issues that were irrelevant to Plaintiffs' defense of B-Line's "failure to withdraw" claim. Thus, for example, Plaintiffs' attorneys:

a.     Highlighted all of the time they spent preparing for and attending depositions of numerous witnesses, even though they did not identify any portions of the depositions that were relevant to the defense of the "failure to withdraw" claim, and Mr. Claflin could not recall at trial whether the witnesses were, in fact, asked any questions that were relevant to B-Line's "failure to withdraw" claim.

b.     Highlighted all of the time they spent attending hearings, without specifying how the hearings were relevant to the "failure to withdraw" claim.

c.     Highlighted all of the time they spent preparing their omnibus response to motions to dismiss filed by Lone Star, Golden Gate, and B-Line, even though only a single paragraph, which did not cite any legal authority, was even

arguably related to the defense of the "failure to withdraw" claim.  (*See* Ex. 53.)
Mr. Hall admitted at trial that highlighting all of the time spent preparing that
omnibus response was inappropriate, even under the standard that Plaintiffs'
attorneys applied when highlighting their billing statements.

     d.    Highlighted all of the time they spent drafting amended pleadings in
the Oregon lawsuit, although only one paragraph of the 4th and 5th Amended
Answers and two paragraphs of the 6th Amended Answer were even arguably
related to the defense of the "failure to withdraw" claim.  (*See* Ex. A-39 ¶ 319; Ex.
34 ¶ 333; Ex. 36 ¶¶ 239, 408.)

     e.    Highlighted all of the legal services they rendered with respect to an
attorney lien that W&R had asserted over funds belonging to B-Line.

     f.    Highlighted all of the time they spent propounding written discovery
requests to B-Line or responding to written discovery requests from B-Line,
without attempting to allocate between requests that arguably related to B-Line's
"failure to withdraw" claim and those requests that did not.

     g.    Highlighted time they spent with respect to written discovery
requests to and from Lone Star and Golden Gate, even though Plaintiffs' dispute
with those parties was not related to Plaintiffs' alleged malpractice and even
though Mr. Claflin admitted at trial that those entries should not have been
highlighted under the standard that he applied.

1        h.     Highlighted time they spent responding to complaints in intervention

2    filed by NOB and Roundup even though those complaints were not related to B-

3    Line's "failure to withdraw" claim.

4       84.    In addition, although Mr. Hall testified that documentary evidence exists of

5    virtually all proceedings in the Oregon lawsuit, including transcripts of depositions and

6    hearings before the court and referee, Plaintiffs did not introduce any documents into

7    evidence, aside from Plaintiffs' own 4th, 5th, and 6th Amended Answers and the related

8    pleadings, that arguably related to B-Line's "failure to withdraw" claim in the Oregon

9    lawsuit after the Washington lawsuit was stayed.  Rather, the only document introduced

10    into evidence from the Oregon lawsuit that expressly mentioned the issue of Plaintiffs'

11    withdrawal was the transcript of the April 17, 2007 hearing before the referee, which

12    preceded the Washington lawsuit by approximately five months.

13       85.    Moreover, B-Line's "failure to withdraw" claim was not inextricably

14    interrelated to the claims that were litigated in the Oregon lawsuit.  Rather, B-Line's

15    "failure to withdraw" claim was a discrete, stand-alone claim that dealt with the filing of

16    proof of claim and transfer of claim forms, but which B-Line eventually abandoned.

17       86.    B-Line's attorney, Mr. Erlichman, testified that when B-Line originally

18    filed its "failure to withdraw" claim in the Washington lawsuit, its lawyers understood,

19    based upon Weinstein's representations while he controlled the company, that an attorney

20    was required to file POC and TOC forms in bankruptcy proceedings.  Therefore, B-

21    Line's lawyers believed that Plaintiffs were required, under the Washington Rules of

22    Professional Conduct, to file a formal "withdrawal" upon B-Line's termination of its

attorney-client relationship with them.  B-Line abandoned its claim after its lawyers learned that B-Line had no basis to sue Plaintiffs for malpractice based on their alleged "failure to withdraw" as B-Line's agent on POC and TOC forms in bankruptcy proceedings.  Instead, B-Line had learned that an attorney is not required to file POC and TOC forms and that filing such forms was a clerical process that could be accomplished electronically by B-Line's own employees.

87.     B-Line also determined that, even if it had grounds to sue Plaintiffs for "failing to withdraw," it did not incur damages as a result of Plaintiffs' alleged "failure to withdraw."  Mr. Ehrlichman testified that B-Line did not incur significant costs to process the POC and TOC forms because B-Line already had the employees and computer systems in place to file the necessary forms electronically.

88.     The court is not persuaded that B-Line omitted its "failure to withdraw" claim in the Oregon lawsuit in order to avoid triggering insurance coverage for its claims against Plaintiffs.  Mr. Ehrlichman testified that he did not contemplate insurance coverage issues when he drafted B-Line's pleadings.  Mr. Ehrlichman also confirmed that he did not have any information related to coverage for B-Line's claims, and that neither he nor anyone at his law firm had seen a copy of Westport's reservation-of-rights letter when he prepared B-Line's pleadings in the Oregon lawsuit.

89.     Lone Star's attorney, Mr. Simon, also testified that Plaintiffs' alleged "failure to withdraw" played no role in the Oregon lawsuit after the Washington lawsuit was stayed, and that he recalled it coming up only as a minor issue in 2007.

90.     At trial, Plaintiffs did not identify any claims pleaded against them in the Oregon lawsuit that triggered Westport's duty to defend, and did not argue that any of B-Line's claims in the Washington lawsuit other than the "failure to withdraw" claim triggered a duty to defend.  Rather, Plaintiffs only identified B-Line's failure to withdraw claim pleaded in the Washington lawsuit as having triggered Westport's duty to defend.

## II.     CONCLUSIONS OF LAW

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action involves citizens of different states and the amount in controversy exceeds $75,000.  The parties agree that Washington state law governs this dispute.

## A.   Westport Did Not Breach its Duty to Defend Plaintiffs

1.     Plaintiffs contend that Westport breached its duty to defend when it refused to pay defense costs Plaintiffs incurred in the Oregon litigation, and, further, that Westport breached this duty in bad faith.  The court concludes that Westport did not breach its duty to defend.

2.     "[T]he duty to defend is different from and broader than the duty to indemnify."  *Am. Best Food, Inc. v. Alea London, Ltd.*, 229 P.3d 693, 696 (Wash. 2010) (citing *Safeco Ins. Co. of Am. v. Butler,* 823 P.2d 499, 504-05 (Wash. 1992)).  "The duty to indemnify exists only if the policy *actually covers* the insured's liability.  The duty to defend is triggered if the insurance policy *conceivably covers* allegations in the complaint."  *Id.*  (citing *Woo v. Fireman's Fund Ins. Co.,* 164 P.3d 454, 459 (Wash. 2007)).  "The duty to defend 'arises when a complaint against the insured, construed

1    liberally, alleges facts which could, if proven, impose liability upon the insured within the

2    policy's coverage.'" *Id.* (quoting *Truck Ins. Exch. v. VanPort Homes, Inc.*, 58 P.3d 276,

3    281-82 (Wash. 2002)).  An insurer "must defend until it is clear that the claim is not

4    covered." *Id.*  However, "an insurer cannot be expected to anticipate when or if an

5    insured will make a claim for coverage; the insured must affirmatively inform the insurer

6    that its participation is desired." *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d

7    866, 873 (Wash. 2008).

8          3.     "The insurer is entitled to investigate the facts and dispute the insured's

9    interpretation of the law, but if there is any reasonable interpretation of the facts or the

10   law that could result in coverage, the insurer must defend." *Id.*  "When the facts or the

11   law affecting coverage is disputed, the insurer may defend under a reservation of rights

12   until coverage is settled in a declaratory action." *Id.*  "Only if the alleged claim is clearly

13   not covered by the policy is the insurer relieved of its duty to defend." *Id.* (quoting *Kirk*

14   *v. Mt. Airy Ins. Co.,* 951 P.2d 1124 (1998)).

15         4.     Bad faith handling of an insurance claim is a tort, and it is analyzed under

16   general tort principles:  duty, breach of that duty, and damages proximately caused by the

17   breach of duty. *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr. Co.*, 169 P.3d 1, 8

18   (Wash. 2007).  In order to establish bad faith, an insured is required to show the breach

19   was unreasonable, frivolous, or unfounded. *Kirk*, 951 P.2d at 1126.  An insurer's failure

20   to defend based upon a questionable interpretation of law is unreasonable. *Am. Best*

21   *Food*, 229 P.3d at 700.

22

ORDER- 32

1    5.    Harm is an essential element of an action for an insurance company's bad

2  faith handling of a claim under a reservation of rights.  *Safeco Ins. Co. v. Butler*, 823 P.2d

3  499, 506 (Wash. 1992).  If the insured shows by a preponderance of the evidence that the

4  insurance company breached its duty of good faith, there is a presumption of harm.  *Id.*

5  The insurance company can rebut this presumption by showing by a preponderance of the

6  evidence that its breach did not harm or prejudice the insured.  *Id.*  If the insured prevails

7  on the bad faith claim, then the insurance company is estopped from denying coverage.

8  *Id.*

9    6.    In Washington, insurance policy interpretation is a pure question of law.

10  *Overton v. Consolidated Ins. Co.,* 38 P.3d 322, 325 (Wash. 2002).  The court must give

11  the terms of the policy a "fair, reasonable, and sensible construction as would be given to

12  the contract by the average person purchasing insurance."  *Id.*  (internal quotation

13  omitted).  Terms defined within a policy are to be construed as defined, while undefined

14  terms are given their "plain, ordinary, and popular" meaning.  *Boeing Co. v. Aetna Cas.*

15  *& Sur. Co.,* 784 P.2d 507, 511 (Wash. 1990).

16    7.    If the policy language on its face is fairly susceptible to two different but

17  reasonable interpretations, ambiguity exists, and the court will apply the interpretation

18  most favorable to the insured.  *Allstate Ins. Co. v. Peasley,* 932 P.2d 1244, 1246 (Wash.

19  1997); *Allstate Ins. Co. v. Hammonds,* 865 P.2d 560, 562 (Wash. Ct. App. 1994)

20  (ambiguity exists "when, reading the contract as a whole, two reasonable and fair

21  interpretations are possible").  Absent evidence that the parties negotiated the terms of the

22

1  insurance policy, a court must construe ambiguity against the insurer "even where the

2  insurer may have intended another meaning." *Allstate,* 865 P.2d at 562.

3        8.      Here, Plaintiffs did not meet their burden to establish that Westport

4  breached its duty to defend, let alone breached that duty in bad faith.

5        9.      The Policy includes the following provisions regarding Westport's duty to

6  defend:

7        The Company shall pay on behalf of any INSURED all LOSS in excess of
         the deductible which any INSURED becomes legally obligated to pay as a
8        result of CLAIMS first made against any INSURED during the POLICY
         PERIOD or within sixty (60) days thereafter, by reason of any
9        WRONGFUL ACT occurring on or after the RETROACTIVE DATE, if
         any . . . .

10
   (Ex. 1, Lawyers Professional Liability Coverage Unit § I.A.)

11
         [Westport shall] have the right and duty to select counsel and arbitrators
12       and to defend any CLAIM for LOSS against any INSURED covered by
         [the Policy], even if such CLAIM is groundless, false or fraudulent, and
13       shall have the right to make such investigation, negotiation and settlement .
         . . of any CLAIM as it deems expedient.

14
   (Ex. 1, Lawyers Professional Liability Coverage Unit § II.A.)

15
         'CLAIM' MEANS a demand made upon any INSURED for LOSS, as
16       defined in each of the attached COVERAGE UNITS. . . .

17 (Ex. 1, General Terms & Conditions at 7.)

18       "LOSS" . . . MEANS the monetary and compensatory portion of any
         judgment, award or settlement . . . .

19
   (Ex. 1, Lawyers Professional Liability Coverage Unit § VII.D.)

20
         "WRONGFUL ACT" . . . MEANS any act, error, omission, circumstance,
21       PERSONAL INJURY or breach of duty in the rendition of legal services
         for others in the INSURED'S capacity as a lawyer, and arising out of the
22       conduct of the INSURED'S profession as a lawyer . . .

ORDER- 34

(Ex. 1, Lawyers Professional Liability Coverage Unit § VII.G.)

10.     This language is unambiguous.  Under the Policy, Westport agreed to defend any claim for loss made *against* Plaintiffs.  (Ex. A, Lawyers Professional Liability Coverage Unit §§ I.A, II.A.)  The Policy does not include a provision triggering a duty to "defend" affirmative claims made by the insured.

11.     The Policy is consistent with Washington law, which provides that the duty to defend "arises when a complaint against the insured, construed liberally, alleges facts which could, if proven, impose liability upon the insured within the policy's coverage." *Truck Ins. Exch.*, 58 P.3d at 281-82.

12.     With respect to the Washington lawsuit, Westport accepted its duty to defend Plaintiffs against the "failure to withdraw" claim B-Line asserted in its complaint in the Washington lawsuit.  (Ex. 10.)  Plaintiffs did not argue at trial that any other claim raised in B-Line's complaint triggered Westport's duty to defend.

13.     With respect to the Oregon lawsuit, Westport did not breach its duty to defend because no complaint was ever filed in the Oregon lawsuit which included claims against Plaintiffs alleging facts having the potential to impose covered liability upon Plaintiffs.  No malpractice claims were filed against Plaintiffs in the Oregon lawsuit until B-Line filed its answer and counterclaims in January 2009.  (Ex. 37.)  Westport, however, concluded that these claims were not covered due to applicable exclusions in the Policy.  (Ex. A-68.)  In addition, Westport concluded (and Plaintiffs did not dispute) that there were no potentially-covered claims asserted in the NOB and Roundup

1   complaints.  (*Id.*)  Because no potentially-covered claim was asserted against Plaintiffs in

2   the Oregon lawsuit, Westport's duty to defend Plaintiffs in that action was not triggered.

3       14.    Plaintiffs nevertheless attempt to characterize Westport's refusal to

4   reimburse them for attorney's fees incurred in the Oregon lawsuit as a breach of the duty

5   to defend.  (*See* Trial Br. at 23-28.)  The court disagrees with this characterization.

6   Rather, Westport accepted its duty to defend Plaintiffs against the potentially-covered

7   "failure to withdraw" claim, and it acknowledged its responsibility to reimburse Plaintiffs

8   for the attorney's fees that were reasonably related to the defense of the covered claim.

9   The court, therefore, characterizes the parties' dispute as a disagreement about the

10  amount of attorney's fees in the Washington and Oregon lawsuits for which Plaintiffs

11  were entitled to reimbursement as "reasonably related" to the defense of the "failure to

12  withdraw" claim asserted in the Washington lawsuit.

13      15.    Because Plaintiffs did not meet their burden to prove that Westport

14  breached its duty to defend, the court need not determine whether Westport breached its

15  duty to defend in bad faith.

16      16.    In sum, Plaintiffs did not meet their burden to prove that Westport breached

17  its duty to defend them against B-Line's "failure to withdraw" claim or that it breached

18  its duty in bad faith.

19  **B.    Westport Did Not Breach the Policy, Violate Washington Insurance**
    **Regulations, or Act in Bad Faith By Denying Plaintiffs a Right to Select**
20  **"Independent Counsel"**

21      17.    Plaintiffs claim that Westport breached the Policy by concealing the policy

22  benefit of selection of independent counsel, and that this conduct also violated

ORDER- 36

1  Washington insurance regulations which prohibit an insurer from misrepresenting or

2  failing to disclose all pertinent insurance policy provisions.

3        18.    In several states, including California, the law provides that where there are

4  divergent interests between the insured and the insurer brought about by the insurer's

5  reservation of rights, and where the insured does not consent to joint representation, the

6  insured is entitled to select its own independent counsel at the expense of the insurer.  *See*

7  *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc.*, 162 Cal. App. 3d 358 (1984)

8  (superseded by statute as stated in *Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61 Cal.

9  App. 4th 999, 1001 n1. (Cal. Ct. App. 1998)); Cal. Civ. Code § 2860.

10        19.    Washington does not recognize an entitlement to "independent counsel" as

11  it is understood under the *Cumis* model.  In Washington, an insured is not entitled by law

12  to choose independent counsel to represent it where there is a potential conflict with the

13  insurer in a reservation of rights situation.  *Johnson v. Cont'l Cas. Co.*, 788 P.2d 598, 601

14  (Wash. Ct. App. 1990) ("In Washington, there is simply no presumption . . . that a

15  reservation of rights situation creates an automatic conflict of interest.  Therefore, the

16  insurer has no obligation *before-the-fact* to pay for its insured's independently hired

17  counsel." (emphasis in original)).  Instead, the insured is entitled to a defense provided by

18  a lawyer selected by the insurer, and the appointed lawyer owes an enhanced obligation

19  of fairness to the insured.  *Id.* at 600; *see Tank v. State Farm Fire & Cas. Co.*, 715 P.2d

20  1133 (Wash. 1986).  Thus, in contrast to *Cumis*, "any breach of the 'enhanced obligation

21  of fairness' in a reservation of rights situation might lead to *after-the-fact* liability of the

22  insurer, retained defense counsel, or both."  *Johnson*, 788 P.2d at 601 (italics added).

20.    The Policy includes the following provisions relevant to selection of counsel:

## II.    DEFENSE, INVESTIGATION AND SETTLEMENT OF CLAIMS

A.  . . . the Company shall have the right and duty to select counsel and arbitrators and to defend any CLAIM for LOSS against any INSURED covered by Insuring Agreement I.A, even if such CLAIM is groundless, false or fraudulent, and shall have the right to make such investigation, negotiation and settlement . . . of any CLAIM as it deems expedient.  . . .

* * *

If an INSURED is entitled to independent counsel (in those instances where the Company agrees to defend a CLAIM, and the Company reserves its rights to deny coverage on grounds which create a conflict of interests between an INSURED and the Company, and the INSURED does not waive the conflict), then the INSURED may select independent counsel. . . . The Company shall be liable only for reasonable and necessary defense costs at rates customarily paid by the Company for the defense of similar CLAIMS in the area where the CLAIM is being defended. . . .

(Ex. 1, Lawyers Professional Liability Coverage Unit § II.A.)

21.    Plaintiffs contend that, under the terms of the Policy, Westport's reservation of rights entitled Plaintiffs to "independent counsel," and that, as a result, Plaintiffs were entitled to select their own counsel to defend them in the Washington lawsuit, rather than accept representation by counsel appointed by Westport.  Thus, according to Plaintiffs, Westport breached the Policy by appointing its own choice of counsel to defend Plaintiff and acted in bad faith by concealing the policy benefit of selection of independent counsel.

ORDER- 38

22.     The court concludes that that the relevant Policy terms are not ambiguous and that Plaintiffs' reading of the Policy is not reasonable.

23.     First, Section II of the Lawyers Professional Liability Coverage Unit, which governs the defense of claims, begins by stating that the insurer has the "right and duty" to select counsel to defend the insured.  (Ex. 1, Lawyers Professional Liability Coverage Unit § II.A.)  Thus, the default rule under the Policy is that the insurer, not the insured, is entitled to select defense counsel.

24.     Second, the language at the end of Section II is an exception to the general rule that the insurer is entitled to select defense counsel.  Under this exception, in cases where the insured is entitled to independent counsel, then the default rule that the insurer selects counsel does not apply, and, instead, the insured has the right to select its defense counsel.  In Washington, an insured is not entitled to "independent counsel" in a reservation of rights situation—rather, the insured is entitled to a defense provided by counsel who is selected and retained by the insurer and who has an enhanced obligation of fairness to the insured.[3]  *Johnson*, 788 P.2d at 600.

25.     Third, Plaintiffs did not prove that Westport's reservation of rights created an actual conflict of interest between Plaintiffs and Westport that would satisfy the parenthetical clause in the second quoted paragraph above.

---

[3] Throughout this litigation, Plaintiffs have urged the court to equate "independent counsel" under *Cumis* with counsel having an "enhanced obligation of fairness" under *Tank*. Because *Cumis* and *Tank* created different remedies for dealing with potential conflicts of interest where an insurer defends its insured, the court declines to do so.

1   26.   As a result, because Plaintiffs were not entitled to "independent counsel"

2   under Washington law, and because Plaintiffs did not establish that Westport's

3   reservation of rights created an actual, rather than a potential, conflict of interest between

4   Plaintiffs and Westport, Westport retained the right to select defense counsel.

5   27.   In light of the court's interpretation of the Policy, Plaintiffs did not meet

6   their burden to prove that Westport violated WAC 284-30-330(1) and WAC 284-30-350.

7   WAC 284-30-330(1) states that "misrepresenting pertinent facts or insurance policy

8   provisions" is an unfair method of competition and an unfair or deceptive act or practice

9   in the business of insurance.  WAC 284-30-350 states that an insurer misrepresents policy

10  provisions when it "fail[s] to fully disclose to first party claimants all pertinent benefits,

11  coverages or other provisions of an insurance policy or insurance contract" or "conceal[s]

12  from first party claimants benefits, coverages or other provisions of any insurance policy

13  or insurance contract when such benefits, coverages or other provisions are pertinent to a

14  claim."  WAC 284-30-350(1), (2).

15  28.   Here, the Policy provided that Westport had the right to select counsel to

16  defend the insured unless the insured was entitled to independent counsel.  Because

17  Plaintiffs were not entitled to independent counsel under Washington law or under the

18  Policy, "selection of counsel" clause was not pertinent to Plaintiffs' claim.  Westport had

19  no obligation under the Washington insurance regulations to advise Plaintiffs of policy

20  terms that did not apply to them.  Accordingly, Plaintiffs have not met their burden to

21  prove that Westport misrepresented a policy provision in violation of WAC 284-30-

22  330(1) or WAC 284-30-350.

29.     In addition, the court concludes that, even if the Policy were ambiguous, and even if Westport had breached the Policy, Plaintiffs did not demonstrate that the breach caused them harm.  Plaintiffs rejected Mr. Wright's representation; Mr. Wright never appeared in the Washington litigation or represented Plaintiffs in any proceeding; and Westport agreed to pay the reasonable fees incurred by Plaintiffs' chosen counsel in defending Plaintiffs against the "failure to withdraw" claim.  *See, e.g., Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co.*, 206 P.3d 1255, 1261 (Wash. Ct. App. 2009) (finding no harm where plaintiff was represented at all times by competent counsel who aggressively defended plaintiff's interests).

30.     Finally, even if harm were presumed, the court finds that Westport has overcome any such presumption by demonstrating by a preponderance of the evidence that Plaintiffs were not harmed, for the same reasons stated in the preceding paragraph.

31.     In sum, the court concludes that Westport did not breach the Policy when it appointed Mr. Wright to defend Plaintiffs, did not breach its duty of good faith by "concealing" a policy benefit of selection of counsel, and did not violate WAC 284-30-330(1) or WAC 284-30-350.

**C.     Plaintiffs are Entitled to Attorney's Fees Incurred in the Oregon Lawsuit for Activites That Were "Reasonably Related" to the Defense of the Potentially-Covered Claim**

32.     Westport agreed to Plaintiffs' request for reimbursement for attorney's fees and expenses that "reasonably related" to the defense of the potentially-covered claims under the standard set forth in *Continental Casualty Co. v. Board of Education of Charles*

1 *County*, 489 A.2d 536 (Md. 1985).[4]  (Ex. 23.)  The parties are in dispute, however,

2 regarding the scope of those "reasonably related" fees.

3        33.     Under *Continental Casualty*, "legal services and expenses are reasonably

4 related to a covered count if they would have been rendered and incurred by reasonably

5 competent counsel engaged to defend a suit against the [insured] arising out of the same

6 factual background . . . but which alleged only the matters complained of in [the covered

7 counts]."  *Id.* at 544.  *See also Nordstrom*, 820 F. Supp. at 536-537 ("So long as the

8 preparation of the defense would have been undertaken for the claims against the officers

9 and directors, incidental benefit to other parties does not provide a basis for allocation.").

10 _____

11        [4] The court applies *Continental Casualty* because both parties have argued that its rule
applies and because Westport agreed to reimburse Plaintiffs under this standard. (Ex. 23.)  It is
not settled, however, that this is the rule in Washington. *Bordeaux, Inc. v. Am. Safety Ins. Co.*,

12 186 P.3d 1188, 1193 (Wash. Ct. App. 2008), is not instructive.  *Bordeaux* involved a
construction defect lawsuit where the damage was covered by two separate insurance policies.

13 Both policies required the insured to pay a "self-insured retention" ("SIR") charge of $100,000.
The *Bordeaux* court held that a single SIR payment applied to damage concurrently covered

14 under the two policies, and that Bordeaux's payment of its own defense costs of $105,399
satisfied the $100,000 SIR.  Noting that it was "clear that the defense costs Bordeaux paid were

15 necessarily related to damages covered by both insurers' policies," the court cited *Nordstrom*
in holding that the defendant insurer had no right to apportion the defense costs between the two

16 policies, and that the plaintiff was entitled to reimbursement of $100,000 it had paid in order to
facilitate the settlement of the underlying case. *Id.*

17        In addition, the Washington federal cases citing the *Continental Casualty* rule are not
directly on point.  Rather, the cases deal with the allocation of defense costs between defendants

18 insured under a directors' and officers' liability ["D&O"] policy and those that are not.  *See
Nordstrom*, 820 F. Supp. at 536 (holding, in the context of a D&O policy, that no right of

19 allocation of defense costs between insured defendants and uninsured defendants exists for the
defense of non-covered claims that are 'reasonably related' to the defense of covered claims);

20 *Branning v. CNA Ins. Cos.*, 729 F. Supp. 728, 732 (W.D. Wash. 1989) (finding a D&O policy
ambiguous regarding whether defense costs were included within liability limits).  *See also

21 Safeway Stores, Inc. v. Nat. Union Fire Ins. Co.*, 64 F.3d 1282, 1289 (9th Cir. 1995) (observing,
in a California case, that "[d]efense costs are covered by a [D&O] policy if they are reasonably

22 related to the defense of the insured directors and officers, even though they may also have been
useful in defense of the uninsured corporation.").

34.     "The party seeking recovery of attorney's fees as damages bears the burden of presenting evidence as to the reasonableness of the amount of fees claimed." *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1164 (Wash. Ct. App. 2007).  In addition, under *Continental Casualty*, the "insured has the burden of establishing that a given item of legal service or expense was reasonably related to the defense" of the covered claim. *Cont'l Cas.*, 489 A.2d at 546.  If the insured is unable to prove that the legal services and expenses are reasonably related to the defense of the covered claims, then the insured is entitled only to nominal damages. *Id.* at 546.

35.     An insurer may be obligated to pay fees and expenses incurred in a separate lawsuit if the insured meets its burden to demonstrate that those fees are reasonably related to the defense of a covered claim. *See Potomac Elec. Power Co. v. Calif. Union Ins. Co.* ["*PEPCO*"], 777 F. Supp. 980, 984 (D.D.C. 1991).  This obligation may extend to fees incurred in the insured's affirmative declaratory judgment action provided the insured meets its burden to prove that the work performed in the affirmative suit reasonably relates to the defense of the covered claim. *See id.* at 984-85 (citing *Cont'l Cas.*, 489 A.2d at 544).

36.     Expenses do not, however, reasonably relate to the defense of the potentially-covered claim if the expenses are excessively disproportionate to the insured's risk of liability on the potentially-covered claim. *See Fed. Realty Inv. Trust v. Pac. Ins. Co.*, 760 F. Supp. 533, 537 (D. Md. 1991) (citing *Cont'l Cas.*, 489 A.2d at 536).

37.     Although the insured is entitled to recover costs incurred before it tendered the lawsuit to the insurer, the insurer is not obligated to pay for expenses incurred before

the duty to defend arose.  *See Griffin v. Allstate Ins. Co.*, 29 P.3d 777, 781 (Wash. Ct. App. 2001); *see also Lawrence v. Nw. Cas. Co.*, 311 P.2d 670, 672-73 (Wash. 1957) (denying costs incurred in defending a complaint that alleged only uncovered claims, but awarding costs incurred after the complaint was amended to allege a covered claim).

38.     Finally, "those factors bearing upon the reasonableness of attorney fees awardable as costs also bear upon the reasonableness of attorney fees recoverable as damages."  *Jacob's Meadow*, 162 P.3d at 1164.

39.     Under the foregoing standards, the court concludes that Plaintiffs are entitled not only to certain fees and expenses incurred in the Washington lawsuit in which the "failure to withdraw" claim was asserted, but also to certain fees incurred in the Oregon lawsuit as "reasonably related" to the defense of the potentially-covered "failure to withdraw" claim.  Thus, although no potentially-covered claim was ever asserted against Plaintiffs in the Oregon lawsuit, Plaintiffs are still entitled to a portion of the fees from this lawsuit by virtue of their connection to the potentially-covered claim.

40.     The court, however, observes that, rather than make an effort at trial to prove the amount of attorney's fees to which they are entitled, Plaintiffs have simply left the court to sift through hundreds of pages of highlighted invoices from the Hall Zanzig and Stoll Berne law firms dating from September 2007 through June 2009 (Ex. 41) as well as hundreds of pages of pleadings and transcripts from the Washington and Oregon lawsuits (*see, e.g.*, Ex. A-30).  Plaintiffs have not identified specific pleadings, hearings, or depositions that involved the "failure to withdraw" issue; nor have they interpreted the attorneys' notes on their invoices or explained how the attorneys' efforts, as reflected in

ORDER- 44

1    the billing records, related to the potentially covered "failure to withdraw" claim.

2    Nevertheless, the court concludes, following its review of the evidence, that Plaintiffs are

3    entitled to reimbursement for a small portion of their claimed attorney's fees.

4         41.    First, under *Griffin*, only those "reasonably related" attorney's fees and

5    costs incurred by Plaintiffs after September 12, 2007—the date that B-Line filed its

6    complaint in the Washington lawsuit alleging the "failure to withdraw" claim against

7    them—are reimbursable.  The court therefore did not consider any invoices prior to

8    September 12, 2007.

9         42.    Second, the court concludes that Plaintiffs are entitled to recover all of the

10   attorney's fees incurred in the Washington lawsuit.  Before it was stayed, the Washington

11   lawsuit involved two primary issues:  B-Line's motion to disqualify the Hall Zanzig firm

12   from representing Plaintiffs in the Washington lawsuit, and Plaintiffs' motion to dismiss

13   or stay the Washington lawsuit.  Neither motion addressed individual claims in the

14   case—rather, each addressed the status of the case as a whole.  (*See* Ex. A-30 (attaching

15   documents).)  Because there is no basis for the court to separate out the work that

16   Plaintiffs' attorneys would have performed with respect to the disqualification motion

17   and the motion to dismiss if B-Line had only asserted the potentially covered "failure to

18   withdraw" claim, the court awards Plaintiffs the $151,742.50 in attorney's fees that they

19   incurred in the Washington lawsuit.

20        43.    Third, the court concludes that Plaintiffs are entitled only to nominal

21   attorney's fees with respect to the Oregon lawsuit.  Under *Continental Casualty* and

22   *PEPCO*, Plaintiffs may be entitled to recover "reasonably related" fees incurred in the

1   Oregon lawsuit, provided they meet their burden to prove that the fees would have been

2   rendered and incurred by reasonably competent counsel engaged to defend a suit against

3   Plaintiffs alleging only the "failure to withdraw" claim.  *PEPCO*, 777 F. Supp. at 984-85

4   (citing *Cont'l Cas.*, 489 A.2d at 544).  Having reviewed the evidence, the court is

5   persuaded that the following work performed by Plaintiffs' attorneys in the Oregon

6   litigation "reasonably related" to the defense of the covered "failure to withdraw" claim:

7           a.      Drafting ¶ 319 of Plaintiffs' 4th Amended Answer seeking

8   resolution of B-Line's claims in the Washington lawsuit. (Ex. A-39 ¶ 319).

9           b.      Reviewing the motions to dismiss the 4th Amended Answer,

10  drafting the paragraph of the omnibus response to the motions to dismiss

11  addressing the 14th claim for relief (Ex. 35 at 23), and attending the September 4,

12  2008 hearing on the motions to dismiss. (Ex. A-45.)

13          c.      Reasserting ¶ 319 as ¶ 333 in the 5th Amended Answer (Ex. 34 ¶

14  333) and reviewing B-Line's motion to dismiss with respect to the tenth claim for

15  relief.[5]

16          d.      Reasserting ¶ 333 as ¶ 239 in the 6th Amended Answer, drafting ¶

17  408, and reviewing B-Line's answer for its response to these paragraphs.  (*See* Ex.

18  36 ¶¶ 239, 408; Ex. 37.)

19

20

21  _____

22      [5] B-Line's motion and Plaintiffs' response did not address ¶ 333 or the malpractice
    claims.

ORDER- 46

1    44.    Plaintiffs did not persuade the court that any other work performed by

2  Plaintiffs' attorneys in the Oregon lawsuit was "reasonably related" to the defense of the

3  covered "failure to withdraw" claim.

4         a.    B-Line's "failure to withdraw" malpractice claim was premised on

5    Plaintiffs' alleged failure to file POC and TOC forms.  This is a distinct issue that

6    was not intertwined with the other B-Line/W&R transition issues that were in

7    dispute in the Oregon litigation.  It is therefore unreasonable to deem all of the

8    attorney's fees attributable to resolving transition issues to be "reasonably related"

9    to the "failure to withdraw" claim.

10         b.    B-Line's "failure to withdraw" claim was not intertwined with the

11    other claims, defenses, counter-claims, and third-party claims asserted in the

12    parties' Oregon pleadings, which involved such issues as breaches of contract and

13    fiduciary duty.  It is therefore unreasonable to deem all of the attorney's fees

14    incurred in drafting, amending, and defending those pleadings to be "reasonably

15    related" to the "failure to withdraw" claim.

16         c.    The only express mention of Plaintiffs' alleged "failure to withdraw"

17    that the court found in any of the Oregon litigation documents occurred in April

18    2007, before Westport's duty to defend arose.

19         d.    Although B-Line reasserted many of its malpractice claims in the

20    Oregon lawsuit, it did not reassert its "failure to withdraw" claim.

21    45.    Finally, Plaintiffs' claim for $1.8 million in attorney's fees is "excessively

22  disproportionate" to their risk of liability on the "failure to withdraw" malpractice claim.

ORDER- 47

*Fed. Realty Inv. Trust*, 760 F. Supp. at 537.  As stated above, B-Line did not reassert or otherwise litigate the "failure to withdraw" after the Washington lawsuit was stayed because it concluded that damages on the malpractice claim would be negligible. Plaintiffs did not offer the court any evidence that they were exposed to liability proportionate to their $1.8 million attorney's fees claim.

46.     Although the court concludes that the activities listed above were "reasonably related" to the defense of the potentially covered "failure to withdraw" claim, Plaintiffs did not meet their burden to establish the amount of attorney's fees they incurred in performing these tasks. *Jacob's Meadow*, 162 P.3d at 1164; *Cont'l Cas.*, 489 A.2d at 546.  Plaintiffs' highlighted billing records are unreasonably over-inclusive.  The court's review of Plaintiffs' billing records revealed that Plaintiffs' attorneys did not follow the rules set forth above in choosing which records to highlight; and Plaintiffs' attorneys admitted that certain entries should not have been highlighted even under the standard they applied.  In addition, Plaintiffs' attorneys did not attribute entries in the billing invoices to specific issues or explain how to interpret the billing records. (*See generally* Ex. 41.)

47.     Following its review of the evidence, the court concludes that reasonably competent counsel engaged to defend a suit against Plaintiffs alleging only the "failure to withdraw" claim would have required only a small number of hours to perform the reasonably related activities in the Oregon lawsuit.  The court therefore awards damages equal to 40 hours of work at Mr. Hall's rate of $450.00 per hour, totaling $18,000.00, as "reasonably related" attorney's fees incurred in the Oregon lawsuit.

48.     In sum, the court concludes that Plaintiffs are entitled to the $151,742.50 in attorney's fees that they incurred in defending the Washington lawsuit, plus $18,000.00 in reasonably related attorney's fees for work in the Oregon lawsuit.

**D.      Westport Did Not Act in Bad Faith When it Did Not Pay Attorney's Fees Incurred in the Oregon Lawsuit**

49.     Plaintiffs claim that Westport acted in bad faith by refusing to pay for expenses incurred in the Washington lawsuit.

50.     In order to establish bad faith, an insured must show that the insured's breach of its duty was "unreasonable, frivolous, or unfounded."  *Kirk*, 951 P.2d at 1126.

51.     There is no Washington case law directly on point regarding an insurer's duty to reimburse its insured under a professional services insurance policy for "reasonably related" attorney's fees incurred in a separate litigation in another jurisdiction.  In addition, the court has reviewed the out-of-jurisdiction authorities cited by the parties and found that none of the cases speak directly to the situation before this court.  The court concludes that although Westport was incorrect when it determined that Plaintiffs' affirmative claims asserted in the Oregon lawsuit were not "reasonably related" to the covered claims, its conclusion to the contrary was not "frivolous, unfounded, or unreasonable" as would give rise to a finding of bad faith.[6]

---

[6] *American Best Food* is not on point.  In *American Best Food*, the Washington Supreme Court held that the insurer breached its duty to defend when it denied a defense based on a questionable interpretation of law.  229 P.3d at 700.  Here, Westport did not deny Plaintiffs a defense.  Rather, Westport concluded that, although coverage was questionable, it had a duty to defend Plaintiffs against the "failure to withdraw" claim and it acknowledged its responsibility to reimburse Plaintiffs for "reasonable and necessary" attorney's fees.  Thus, the parties' dispute does not center on a breach of the duty to defend, but rather on how to quantify the fees.

**E.**  **Westport Did Not Breach Its Duty to Perform a Reasonable Investigation or Violate Washington Insurance Regulations Requiring a Reasonable Investigation**

52.     Plaintiffs claim that Westport and its adjuster, Mr. Hultquist, acted in bad faith by failing to conduct a reasonable investigation of its claim that it was entitled to reimbursement for attorney's fees incurred in the Oregon lawsuit.

53.     "[W]here an insurer acts in bad faith in handling a claim under a reservation of rights, the insurer is estopped from denying coverage." *Safeco Ins. Co. v. Butler*, 823 P.2d 499, 504-05 (Wash. 1992).  An insurer who accepts its duty to defend "but then performs the duty in bad faith is no less liable than the insurer who accepts but later rejects the duty." *Id.* at 504.  "In order to establish bad faith, an insured is required to show the breach was unreasonable, frivolous, or unfounded." *Kirk*, 951 P.2d at 1126.

54.     "[A]n insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit." *Indus. Indem. Co. v. Kallevig*, 792 P.2d 520, 526 (Wash. 1990).

55.     "The implied covenant of good faith and fair dealing in the policy should necessarily require the insurer to conduct any necessary investigation in a timely fashion and to conduct a reasonable investigation before denying coverage.  In the event the insurer fails in either regard, it will have breached the covenant and, therefore, the policy." *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933 (Wash. 1998) (quoting 1 Allan D. Windt, *Insurance Claims & Disputes* § 2.05, at 38 (3d ed. 1995)).  *See also Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1236-38 (W.D. Wash. 2008)

1   (granting insured's motion for summary judgment against two insurers where (1) one

2   insurer denied the insured's claims after conducting "no investigation at all;" and (2) the

3   second insurer based its denial on its adjuster's assumptions and speculation).

4        56.    The court concludes that Westport's investigation of Plaintiffs' claim was

5   not unreasonable and that Westport did not breach its duty to investigate in bad faith.

6        57.    Between September 24, 2007, when Plaintiffs tendered B-Line's complaint

7   in the Washington lawsuit to Westport, and Plaintiffs' counsel's January 15, 2008 letter,

8   Plaintiffs' communications to Westport referred only to the Washington lawsuit.

9   Plaintiffs did not tender the Oregon lawsuit to Westport in their initial tender or in their

10  later letters or telephone calls.  "An insurer cannot be expected to anticipate when or if an

11  insured will make a claim for coverage; the insured must affirmatively inform the insurer

12  that its participation is desired."  *USF*, 191 P.3d at 873 (quoting *Griffin*, 29 P.3d at 781-

13  82 (internal edits omitted).)  Accordingly, Westport did not breached its duty to

14  investigate or act in bad faith by not investigating potential coverage for claims asserted

15  in the Oregon lawsuit before January 15, 2008.

16       58.    On January 15, 2008, Plaintiffs requested coverage for expenses in the

17  Oregon lawsuit for the first time.  On February 1, 2008, Plaintiffs sent Westport a number

18  of materials from the Washington and Oregon lawsuits.  (Ex. A-30.)   Westport reviewed

19  the documents and, on February 29, 2008, advised Plaintiffs that it did not believe that

20  the policy covered any activities in the Oregon lawsuit.  (Ex. A-31.)  The court has

21  reviewed the submitted documents and agrees with Westport's assessment.  The court

22

1  concludes that Westport did not act unreasonably or in bad faith between January 15,

2  2008 and February 29, 2008.

3      59.     In its February 29, 2008 letter, Westport acknowledged that it was

4  obligated to pay Plaintiffs for the "reasonable and necessary expenses" incurred in the

5  defense of B-Line's "failure to withdraw" claim, and requested Plaintiffs' attorneys'

6  billing statements for those expenses.  (Ex. A-31.)  Plaintiffs then did not respond to

7  Westport's letter or provide any additional information regarding its claims until June 24,

8  2008.  Westport did not act unreasonably or in bad faith when it did not perform any

9  additional investigation between February 29, 2008 and June 24, 2008.

10     60.     On June 24, 2008, Plaintiffs provided Westport with nine months of billing

11 records seeking reimbursement for nearly $500,000.00 in attorney's fees incurred in both

12 Washington and Oregon.  (Ex. 20.)  Plaintiffs did not explain how the billed charges

13 related to the potentially-covered claim, nor did they provide Westport with additional

14 documents from the Oregon lawsuit.  (*See id.*)  Westport reviewed the invoices, produced

15 a detailed summary in which it attempted to attribute billing entries to litigation activities,

16 and, in a July 28, 2008 letter, offered to pay all of the expenses incurred in the

17 Washington lawsuit.  (Ex. 23.)  Westport alternatively requested additional information to

18 help it determine whether there were expenses incurred in the Oregon lawsuit that were

19 reasonably related to the defense of the potentially-covered claim.  (*Id.*)  Westport did not

20 act in bad faith in reviewing and responding to Plaintiffs' billing records submission.

21

22

61.     Between July 28, 2008 and mid-November 2008, the parties were engaged in discussions about mediating Plaintiffs' claim for reimbursement.  The mediation failed in November 2008, and Plaintiffs filed the instant lawsuit.

62.     Between November 2008 and late January 2009, Westport and Plaintiffs were in regular communication regarding the Oregon litigation.  (Exs. A-45, A-46, A-47, A-49, A-51, A-53, A-54, A-55, A-56, A-63.)  Plaintiffs' attorneys sent Westport emails attaching pleadings from the Oregon lawsuit, and Westport reviewed the pleadings and responded to Plaintiffs.  The court concludes that Westport's investigation was not unreasonable or in bad faith during this period.

63.     On January 28, 2009, after Plaintiffs sent Westport B-Line's answer and counterclaims and NOB's complaint in intervention, Westport acknowledged that the pleadings asserted malpractice claims against Plaintiffs and accepted tender of these claims.  (Ex. A-58.)  Westport reviewed the complaints and, on March 13, 2009, sent Plaintiffs a letter stating its conclusion that none of the claims were potentially covered under the Policy and that Westport would not provide Plaintiffs a defense.  (Ex. A-68.)  One week later, the parties to the Washington and Oregon lawsuits entered into their global settlement.  (Ex. 40.)  Plaintiffs sent Westport no additional documents until it notified them of the global settlement on May 1, 2009.  The court concludes that Westport's conduct during this final period was reasonable.

64.     Therefore, having reviewed the evidence of Westport's conduct throughout the course of the underlying Washington and Oregon lawsuits, the court concludes that

1 Plaintiffs did not meet their burden to demonstrate that Westport breached its duty to

2 perform a reasonable investigation or investigated Plaintiffs' claims in bad faith.

3      65.    In light of this conclusion, Plaintiffs also did not meet their burden to prove

4 that Westport violated WAC 284-30-330(4), which states that "[r]efusing to pay claims

5 without conducting a reasonable investigation is an unfair method of competition and an

6 unfair or deceptive act or practice in the business of insurance."

7 **F.**    **Westport Did Not Act in Bad Faith By Faxing the Reservation-of-Rights**
       **Letter to B-Line**

8

9      66.    Plaintiffs argued that Westport acted in bad faith when it faxed its

reservation-of-rights letter to B-Line on December 12, 2007.  The court disagrees.

10 Westport faxed the letter to the fax number that appeared on the most recent

11 correspondence it had received from Plaintiffs.  Because Westport made a reasonable

12 mistake, its conduct when it faxed the letter to the number that appeared on Plaintiffs'

13 October 4, 2007 letter was not unreasonable, frivolous, or unfounded, *Kirk*, 951 P.2d at

14 1126, and therefore was not in bad faith.

15 **G.**    **Westport Did Not Breach Its Duty to Indemnify Plaintiffs**

16      67.    "The duty to indemnify exists only if the policy actually covers the

17 insured's liability." *Am. Best Food*, 229 P.3d at 696.  Determining whether coverage

18 exists is a two-step process. *Overton*, 38 P.3d at 329.  "The burden first falls on the

19 insured to show its loss is within the scope of the policy's insured losses." *Id.*  "If such a

20 showing has been made, the insurer can nevertheless avoid liability by showing the loss

21 is excluded by specific policy language." *Id.*

22

68.     The Policy provides as follows:

'CLAIM' MEANS a demand made upon any INSURED for LOSS, as defined in each of the attached COVERAGE UNITS. . . .

(Ex. 1, General Terms & Conditions at 7.)

"LOSS" . . . MEANS the monetary and compensatory portion of any judgment, award or settlement, provided always that LOSS shall not include:
1.     civil or criminal fines, penalties, fees or sanctions;
2.     punitive or exemplary damages,including the multiplied portion of any multiple damages;
3.     the return by any INSURED of any fees or remuneration paid to any INSURED; or
4.     any form of non-monetary relief.

(Ex. 1, Lawyers Professional Liability Coverage Unit § VII.D.)

69.     Plaintiffs did not meet their burden to prove that they suffered "loss" cognizable under the Policy.

70.     First, the Policy unambiguously provides that "loss" includes only the monetary and compensatory portion of a judgment.  Here, Plaintiffs were not required to pay any money to any other party as part of the settlement agreement.  Rather, Plaintiffs received several million dollars under the settlement.  (Exs. 40, A-70, A-72.) Accordingly, there was no "monetary or compensatory" loss at issue.

71.     Second, assuming without deciding that the "failure to withdraw" claim was actually covered under the Policy, Plaintiffs did not demonstrate that they suffered any covered "loss" that was attributable to the potentially-covered "failure to withdraw" claim.  Plaintiffs did not prove that they were exposed to any liability based on the claim, and the settlement agreement did not apportion any value or consideration to the claim.

ORDER- 55

72.     For these reasons, the court concludes that Westport did not breach its duty to indemnify Plaintiffs.

**H.     Plaintiffs Are Not Entitled to Coverage By Estoppel or to Recover the Value of Their "Forced Sale" Claim**

73.     Plaintiffs argued that they are entitled to coverage by estoppel based on Westport's bad faith, and that the loss attributable to the "failure to withdraw" claims is the value of their surrendered "forced sale" claim.

74.     Because Plaintiffs did not prove that Westport breached any of its duties in bad faith, they are not entitled to coverage by estoppel or the value, if any, of their claim for damages resulting from the "forced" sale of B-Line.  Further, even if Westport had breached its duties in bad faith, Plaintiffs did not meet their burden to prove that the parties to the settlement negotiation attributed any value to the "forced sale" claim.  *See* Allen D. Windt, 1 *Insurance Claims & Disputes* § 6:30 (5th ed. 2007) ("The issue is not whether the insured's claim was demonstrably valid, but rather whether and to what extent the parties to the settlement attributed a value to it. . . . The validity of the insured's claim is not directly relevant; the only relevant consideration is its settlement value at the time of the settlement.").

**I.     Westport  Did Not Violate the Washington Insurance Fair Conduct Act**

75.     The Washington Insurance Fair Conduct Act ("IFCA") provides that "any first party claimant to a policy of insurance who is unreasonably denied a claim for coverage or payment of benefits by an insurer may bring an action . . . to recover the

1  actual damages sustained, together with the costs of the action, including reasonable

2  attorney's fees and litigation costs . . . ."  RCW 48.30.015(1).

3      76.    A court "may, after finding that an insurer has acted unreasonably in

4  denying a claim for coverage or payment of benefits or has violated [certain insurance

5  regulations], increase the total award of damages to an amount not to exceed three times

6  the actual damages."  RCW 48.30.015(2).  A court "shall, after a finding of unreasonable

7  denial of a claim for coverage or payment of benefits, or after a finding of a violation of a

8  rule in subsection (5) of this section, award reasonable attorney's fees and actual and

9  statutory litigation costs, including expert witness fees, to the first party claimant of an

10 insurance contract who is the prevailing party in such an action."  RCW 48.30.015(3).

11 The statute provides a list of violations that give rise to treble damages or to an award of

12 attorney's fees and costs; this list includes violations of WAC 284-30-330, 350, 360, 370,

13 and 380.  RCW 48.30.015(5).

14     77.    Violations of the regulations enumerated in RCW 48.30.015(5) provide

15 grounds for trebling damages or for an award of attorney's fees; they do not, on their

16 own, provide a cause of action absent an unreasonable denial of coverage or payment of

17 benefits.  RCW 48.30.015(1).  *Travelers Indem. Co. v. Bronsink*, No.C08-1524JLR, 2010

18 WL 148366, at *2 (W.D. Wash. Jan 12, 2010); *see also Lease Crutcher Lewis WA, LLC*

19

20

21

22

1  *v. Nat. Union Fire Ins. Co. of Pittsburgh, PA*, No. C08-1862RSL, 2010 WL 4272453, at
2  *5 (W.D. Wash. Oct. 15, 2010).[7]

3       78.     Here, as discussed above, Westport accepted its duty to defend Plaintiffs
4  and its refusal to reimburse Plaintiffs for attorney's fees incurred in the Oregon lawsuit
5  was not unreasonable.  Because Plaintiffs did not meet their burden to demonstrate that
6  Westport  "unreasonably denied a claim for coverage or payment of benefits by an
7  insurer," Plaintiffs cannot prove that Westport violated the IFCA.

8  **J.     Westport Did Not Violate the Washington Consumer Protection Act**

9       79.     To establish a violation of the Washington Consumer Protection Act
10  ("CPA"), a plaintiff must demonstrate: "(1) an unfair or deceptive act or practice; (2)
11  occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or
12  her business or property; (5) causation."  *Hangman Ridge Training Stables, Inc. v. Safeco*
13  *Title Ins. Co.*, 719 P.2d 531, 532 (Wash. 1986); RCW 19.86.060.

14       80.     Violations of WAC 284-30-330 may constitute per se violations of the
15  CPA, provided the other *Hangman Ridge* factors are also met.  *Truck Ins. Exch.*, 58 P.3d
16  at 283-84.  In addition, an insurer's bad faith constitutes a per se violation of the CPA.
17  *Ledcor*, 206 P.3d at 1262.

18       81.     Plaintiffs contend that Westport violated the CPA by engaging in the
19  following practices:

20  _____

21       [7] The IFCA became effective in December 2007, and only applies prospectively.  *See*
    *Aecon Bldgs., Inc. v. Zurich N. Am.*, No. C07-832MJP, 2008 WL 895978, at *2 (W.D. Wash.
    Mar. 28, 2008).  There are no reported decisions of the Washington Court of Appeals or
22  Washington Supreme Court interpreting RCW 48.30.015.

ORDER- 58

a.    "Misrepresenting pertinent facts or insurance policy provisions," WAC 284-30-330(1), by concealing the selection of counsel provision in the Policy;

b.    "Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies" and "failing to affirm or deny coverage of claims within a reasonable time after fully completed proof of loss documentation has been submitted," WAC 284-30-330(2) & (5), by not delivering its reservation-of-rights letter until nearly 10 weeks after Mr. Weinstein's telephone conference with Mr. Hultquist; and

c.    "Refusing to pay claims without conducting a reasonable investigation," WAC 284-30-330(4), by not investigating and paying defense costs Plaintiffs incurred in the Oregon litigation.

82.    The court concluded above that Westport did not act in bad faith, did not conceal a "selection of counsel" policy benefit in violation of WAC 284-30-330(1), and did not perform an unreasonable investigation in violation of WAC 284-30-330(4).

83.    The court concludes, however, that Westport violated WAC 284-30-330(2) & (5) by unreasonably delaying issuing its reservation-of-rights letter.  Westport acknowledged receipt of Plaintiffs' claim on September 24, 2007; Mr. Hultquist had a telephone conference with Mr. Weinstein on October 3, 2007; and Mr. Hultquist submitted his initial recommendation that the claim for internal review on October 4, 2007.  The claim notes indicate that by November 1, 2007, Mr. Hultquist's draft denial letter had completed two levels of review and Westport had obtained the opinion of

1   coverage counsel.  (Ex. 32.)  There is no further entry in the claim notes until December

2   12, 2007, when Mr. Hultquist left a message for the insured.  (*Id.*)  There is no evidence

3   of any communication from Westport to Plaintiffs between October 3, 2007, and

4   December 12, 2007, or of any actions taken by Westport on Plaintiffs' claim between

5   November 1, 2007, and December 12, 2007; and Westport has not explained the six-week

6   delay between receiving coverage counsel's opinion and notifying Plaintiffs that

7   Westport would defend them under a reservation of rights.

8          84.     Plaintiffs did not, however, prove that they suffered injury to their business

9   or property as a result of this delay as required to state a claim under the CPA.  *Hangman*

10  *Ridge*, 719 P.2d at 532.  Because Plaintiffs did not prove injury or causation, they did not

11  meet their burden to prove that Westport violated the CPA.

12  **K.     Plaintiffs Are Not Entitled to an Award of Attorney's Fees**

13         85.      Plaintiffs argue that they are entitled to an award of attorney's fees under

14  *Olympic Steamship*, the IFCA, and the CPA.  The court disagrees.

15         86.     First, Plaintiffs are not entitled to attorney's fees pursuant to *Olympic*

16  *Steamship Co. v. Centennial Insurance Co.*, 811 P.2d 673, 681 (Wash. 1991).  In *Olympic*

17  *Steamship*, the Washington Supreme Court held that an insured has the right to recoup

18  attorney's fees where "an insurer refuses to defend or pay the justified action of the

19  insured."  811 P.2d at 681.  *Olympic Steamship* does not apply, however, when coverage

20  is not at issue.  *Dayton v. Farmers Ins. Group*, 876 P.2d 896 (Wash. 1994); *Leingang v.*

21  *Pierce County Med. Bureau, Inc.*, 930 P.2d 288, 293-94 (Wash. 1997).  Rather, "*Olympic*

22  *Steamship* authorizes an award of attorney fees only if the insured is required to litigate

1    an issue of coverage, as opposed to the value of the claim." *Woo v. Fireman's Fund Ins.*

2    *Co.*, 208 P.3d 557, 566 (Wash. Ct. App. 2009) (citing *Price v. Farmers Ins. Co.*, 946 P.2d

3    388, 392 (Wash. 1997)).

4            87.     Here, as discussed above, Plaintiffs did not prevail on their claims that

5    Westport breached the Policy or acted in bad faith.  Rather, the sole dispute in which they

6    did prevail involved the amount of attorney's fees Westport must reimburse, rather than

7    whether Westport was required to reimburse attorney's fees in the first instance.[8]

8    *Olympic Steamship* does not, therefore, apply.

9            88.     Second, Plaintiffs have not met their burden to establish that Westport

10   unreasonably denied a claim for coverage or payment of benefits as required by the

11   IFCA, RCW 48.30.015(1).  Because they do not meet the threshold condition for proving

12   an IFCA claim, they are not entitled to attorney's fees under the IFCA.

13           89.     Finally, Plaintiffs are not entitled to attorney's fees under the CPA.  A party

14   who successfully brings an action under the CPA is entitled to attorney fees, whether or

15   not it has suffered actual damages.  *Ledcor*, 206 P.3d at 1261 n.18 (citing *Schmidt v.*

16   *Cornerstone Investments, Inc.*, 795 P.2d 1143, 1151 (Wash. 1990)).  Although Westport's

17   conduct violated WAC 284-30-330, Plaintiffs must establish that the violations caused

18   them injury in their business or property in order to prevail on their claim.  *Hangman*

19   _____

20           [8] *See Kroeger v. First Nat. Ins. Co. of Am.*, 908 P.2d 371, 373 (Wash. Ct. App. 1995)
     (observing, in the personal injury protection coverage context, (1) that coverage is denied when
21   the insurer says it has no contractual duty to pay even if the insured proves that the expenses are
     reasonable and necessary, but (2) that coverage is not denied if the insurer accepts its contractual
22   duty to pay reasonable and necessary expenses but denies that certain proposed expenses are
     reasonable and necessary).

1   *Ridge*, 719 P.2d at 532.  Because Plaintiffs did not prove that they suffered injury

2   resulting from the delay in issuing the reservation-of-rights letter, Plaintiffs are not

3   entitled to attorney's fees under the CPA.

4   **L.     Westport Is Not Entitled To An Allocation of the Attorney's Fees Plaintiffs
           Incurred in the Washington Lawsuit**

5           90.     In its counterclaim, Westport seeks reimbursement for 80% of the

6   $151,742.50 attorney's fees payment that made to Plaintiffs.  Westport proposes 80%

7   because (1) only one of B-Line's four causes of actions contained claims that were

8   potentially covered and (2) only one of the five allegedly wrongful acts alleged in the one

9   cause of action was potentially covered under the Policy.

10          91.     Westport relies on *Waite v. Aetna Casualty & Surety Co.*, 467 P.2d 847,

11  853 (Wash. 1970), in which the Washington Supreme Court held that when a complaint

12  filed against an insured contains both covered and uncovered claims, the insurer's duty to

13  defend is limited to the covered claims.  *Id.* at 853.  In *Waite*, the insured refused the

14  insurer's offer to defend because the insured feared a conflict of interest.  The court held

15  that it was reasonable for the trial court to order the insurer to pay one-third of the

16  attorney's fees incurred by the insured in the underlying litigation where only two of the

17  six claims against the insured were covered under the policy.  *Id.* at 850, 853.

18          92.     The court declines to follow the model described in *Waite*.  The

19  Washington lawsuit was stayed just over three months after it was filed.  The court's

20  review of the evidence indicates that two primary issues were litigated during these

21  months:  B-Line's motion to disqualify Plaintiffs' lawyers, and Plaintiffs' motion to

22

ORDER- 62

1    dismiss or stay the action.  Both motions involved issues affecting the entire lawsuit and

2    did not involve the litigation of individual claims.  The court has no basis for allocating

3    the costs incurred in connection with these motions among the various claims asserted in

4    the lawsuit, and Westport has not directed the court to any specific work performed in the

5    Washington lawsuit that is not "reasonably related" to the defense of the covered claim.

6         93.    The court therefore concludes that Westport did not meet its burden to

7    prove that it is entitled to reimbursement for a portion of the attorney's fees that it already

8    paid to Plaintiffs.

### III.    ORDER

10        Based on the foregoing findings of fact and conclusions of law, the court directs

11   the clerk to enter judgment in favor of Plaintiffs for $169,742.50, to be offset by the

12   $151,742.50 that Westport has already paid to Plaintiffs.

13        Dated this 14th day of March, 2011.

15   _____

16   JAMES L. ROBART
     United States District Judge

ORDER- 63